**In The Matter Of:**

**Farr**

**vs.**

**Amazon.com.kydc**

**Deposition of**

**Katie Gannon**

**January 08, 2016**



**Central Court Reporting**

800.442.DEPO

Support@centralcourtreporting.com

www.centralcourtreporting.com

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF KENTUCKY

3                 NORTHERN DIVISION AT COVINGTON

4      _____

5    CHRISTY FARR,                    )  No. 2:15-64-WOB-JGW
                                      )
6               Plaintiff,            )
                                      )
7          vs.                        )
                                      )
8    AMAZON.COM.KYDC LLC,             )
                                      )
9               Defendant.            )
                                      )
10                                    )

11     _____

12            DEPOSITION UPON ORAL EXAMINATION OF
                          KATIE GANNON
13                     January 8, 2016
                      Seattle, Washington
14     _____

15

16

17

18                    **CERTIFIED COPY**

19

20

21

22

23
         Taken Before:
24
         Laura A. Gjuka, CCR #2057
25       Certified Shorthand Reporter

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:          TED C. COPETAS (By Skype)
                                  Eberly McMahon Copetas
 3                                2321 Kemper Lane, Suite 100
                                  Cincinnati, OH 45206
 4                                513-533-1103
                                  tcopetas@emclawyers.com
 5

 6    For the Defendants:         SADHNA G. TRUE
                                  Dinsmore & Shohl
 7                                Lexington Financial Center
                                  250 West Main Street
 8                                Suite 1400
                                  Lexington, KY 40507
 9                                859-425-1000
                                  sadhna.true@dinsmore.com
10

11    Also Present:              Christy Farr (By Skype)
                                 Catherine Thompson
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Farr vs. Amazon.com.kydc                              Katie Gannon 01/08/2016

```
 1                        EXAMINATION INDEX

 2      EXAMINATION BY:                          PAGE NO.

 3      Mr. Copetas:                                    5

 4      Ms. True:                                      73

 5

 6                          EXHIBIT INDEX

 7      EXHIBIT NO.       DESCRIPTION              PAGE NO.

 8      Exhibit No. 1     4 pages, Various E-mails       19
                          AMAZON/FARR_000309-000312
 9
        Exhibit No. 2     2 pages, E-mail from Ms. Gannon  28
10                        to Ms. Gannon
                          AMAZON/FARR_000318-000319
11
        Exhibit No. 3     4 pages, NAFC Security Standards  62
12                        of Conduct
                          AMAZON/FARR_000446-000449
13
        Exhibit No. 4     5 pages, E-mail from Ms. Rolfes   65
14                        to Ms. Gannon, 12/30/14
                          AMAZON/FARR_001491-001495
15
        Exhibit No. 5     2 pages, E-mail from Ms. Rolfes   69
16                        to Ms. Rolfes, Ms. Gannon, and
                          Ms. Whitley, 12/30/14
17                        AMAZON/FARR_001481-001482

18      Exhibit No. 6     5 pages, E-mail from Ms. Rolfes   70
                          to Ms. Farr, Structured
19                        Development Plan, Undated
                          AMAZON/FARR_000299-000303
20

21

22

23

24

25
```

Katie Gannon 01/08/2016

```
 1                      QUESTIONS MARKED

 2    LINE:       PAGE:

 3    61          12

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Central Court Reporting   800.442.3376

 1          BE IT REMEMBERED that on the 8th of January,

 2     2016, 9:17 a.m., at 1700 Seventh Avenue, Suite 2100,

 3     Seattle, Washington, before LAURA A. GJUKA, CCR# 2057,

 4     Washington State Certified Court Reporter residing at

 5     University Place, authorized to administer oaths and

 6     affirmations pursuant to RCW 5.28.010.

 7          WHEREUPON the following proceedings were had,

 8     to wit:

 9                          * * * * * *

10     KATIE GANNON,   having been first duly sworn by

11                     the Court Reporter, was examined and

12                     testified as follows:

13

14                     EXAMINATION

15     BY MR. COPETAS:

16  Q  Katie, first of all, thank you for appearing today.  We

17     do appreciate it that you're doing so voluntarily.  I'm

18     going to go over a couple of brief instructions and then

19     we'll ask some questions.

20         First of all, have you ever had your deposition

21     taken before?

22  A  No.

23  Q  Okay.  So general rules, you want to make sure that

24     you're answering clearly with yeses or noes, as opposed

25     to head shakes or uh-huhs and things like that, because

```
 1      we want the court reporter to get a clear transcript.

 2      She has to type down everything that both you and I say.

 3          Secondly, if I ask a question that is unclear or

 4      something that you don't understand, feel free to stop

 5      me and I'll try to rephrase it in a way that makes

 6      sense.

 7          Along the lines of getting a clear transcript, I am

 8      going to do my best to not interrupt your answers with

 9      questions, and then I'll ask you at the same time to

10      wait until I finish a question before you give your

11      answer.

12   A  Okay.

13   Q  That way we're not talking over each other.

14   A  Okay.

15   Q  If at some point you need a break, just let me know, and

16      we will finish the line of questioning we're on and go

17      ahead and take a break.

18   A  Okay.

19   Q  Would you please state your full name for the record.

20   A  Katie Lee Ann Gannon.

21   Q  What's your date of birth?

22   A  5/11/81.

23   Q  And what is your current address?

24   A  24840 184th Place Southeast, Covington, Washington

25      98042.
```



```
 1   Q  And is that a house?

 2   A  Yes.

 3   Q  How long have you lived there?

 4   A  Four weeks.

 5   Q  Congratulations.

 6   A  Thanks.

 7   Q  Are you married?

 8   A  No.

 9   Q  Do you have any children?

10   A  No.

11   Q  So since you've only been there four weeks, is there a

12      likelihood that you might move in the next year or so?

13   A  Yes, I'm building a house.  I'm just staying with my

14      parents.

15   Q  Do you have the address of the house you're building?

16   A  I don't have that memorized.  It's in Maple Valley,

17      Washington.

18   Q  Maple Valley.  When do you think that will be finished?

19   A  They say May, but everyone tells me probably expect

20      July.

21   Q  That's understandable.

22   A  Yeah.

23   Q  Okay.  And what is the best phone number to reach you?

24   A  (206) 465-3825.

25   Q  Okay.  Other than minor traffic violations, have you
```



```
 1      ever pled guilty to or been convicted of a crime?

 2   A  No.

 3   Q  Have you ever been a plaintiff or a defendant in a

 4      lawsuit before?

 5   A  No.

 6   Q  Have you ever testified in a lawsuit before?

 7   A  No.

 8   Q  Okay.  Where are you currently employed?

 9   A  I am employed at Boeing Employees Credit Union.

10   Q  What's your job there?

11   A  I'm the work life and wellness program manager.

12   Q  And when did you start -- I'm just going to call it

13      BECU, when did you start there?

14   A  I started as a temp in June and a full time in August.

15   Q  And what is your level of compensation there currently?

16   A  I'm at 77,000.

17   Q  And do you have benefits?

18   A  Yes.

19   Q  What are your benefits?

20   A  Just the full benefits package, medical, dental, vision,

21      PTO, 401(k) pension.

22   Q  Do you have an opportunity for equity?

23   A  Stock?

24   Q  Yes.

25   A  No.
```



```
 1   Q   And how did you come to start as a temporary employee
 2       there?
 3   A   A friend of mine was in the role before me and BECU
 4       decided they wanted to elevate the role to more of a PM
 5       role, and this friend recommended me.  So I started the
 6       interview process around April/May time period.  More of
 7       informational, not official interviews.
 8   Q   So when you first went there, you didn't foresee
 9       becoming a full-time employee or permanent employee?
10   A   I did.  I still -- I believed that I would end up taking
11       the full-time role.  The role just wasn't ready yet as
12       they wanted it to be.  It wasn't completed and approved
13       by the executive management team at the level in which
14       it is now.  It was a couple grades lower before.
15   Q   And what was your compensation as a temporary employee?
16   A   As a temporary employee?  I think it was $32 an hour.
17       I'm pretty sure it was $32 an hour.
18   Q   And where were you employed before BECU?
19   A   Amazon.
20   Q   When did you leave Amazon or your last day of work
21       there?
22   A   May 30th or 31st.  May 31st.
23   Q   Of '15?
24   A   Yes.
25   Q   And what was your most recent position at Amazon?
```



```
 1    A   Human resources business partner.

 2    Q   Okay.  And what were your duties as an HRBP?

 3    A   As an HRBP, I had a specific client group that I

 4        supported from an HR standpoint.  It included generalist

 5        activities, employee relations, assistance with

 6        performance management, investigations, that type of

 7        stuff.

 8    Q   Okay.  And for what employee population did you do that?

 9    A   My employee population was HR operations within

10        North America, specifically from Texas west, but I also

11        assisted my manager with the East Coast as well.

12    Q   And when you say HR operations, so you were human

13        resources for human resources?

14    A   Yes.

15    Q   Were you hired into this position or was it something

16        you were promoted into?

17    A   I was hired into it.

18    Q   Okay.  Have you ever worked in a fulfillment center?

19    A   No.

20    Q   In HR for HR, do you have HRAs?

21    A   No.

22    Q   So no HRAs or senior HRAs that report in to anybody in

23        HR for HR?

24    A   Correct.

25    Q   Okay.  Are you familiar with the HRA position?
```



Farr vs. Amazon.com.kydc                      Katie Gannon 01/08/2016

```
 1   A   Yes.
 2   Q   And, in your understanding, what does an HRA do in a
 3       fulfillment center?
 4   A   Our HRA staff were the first line of defense for
 5       employee questions, concerns, a lot of process and
 6       orientation-type duties and supported the employee staff
 7       within the fulfillment center.
 8   Q   So they address kind of the lower-level concerns --
 9   A   Yes.
10   Q   -- of the employees on a day-to-day basis?
11   A   Yes.
12   Q   And more serious issues go to the HRBPs and above;
13       correct?
14   A   Typically, unless an HRA was being stretched for
15       promotion opportunities.
16   Q   Okay.  What was your compensation at Amazon at the time
17       you left?
18   A   I think it was 72 or 73,000 annually.
19   Q   Okay.  Did you have a bonus opportunity?
20   A   Not bonus, no.
21   Q   But you had equity?
22   A   Yes.
23   Q   And did you leave any equity on the table when you left
24       Amazon?  Were there unvested shares that would have
25       vested had you stayed?
```



Central Court Reporting  800.442.3376

```
 1   A   Yes.

 2   Q   How much do you think you left on the table?

 3   A   About $15,000 at the time of what the stock was at that

 4       time.

 5   Q   So can I ask, why did you leave Amazon?

 6   A   I wasn't interested in that particular role anymore and

 7       wanted to find something different.

 8   Q   Why were you not interested in the role anymore?

 9   A   I wanted to focus my energy on more positive employee

10       benefits and move away from the performance management

11       and negative aspects of what sometimes the HRBP role

12       was.

13   Q   What did you not like about the negative aspects of the

14       HRBP role?

15   A   It's not fun to terminate somebody or to write somebody

16       up.

17   Q   Sure.

18   A   Yeah.

19   Q   And how often were you involved in terminating someone

20       on a, let's say, weekly basis?

21   A   Probably not a weekly basis, but certainly a monthly

22       basis.  I did a lot of employee relations for the HR for

23       HR team, and we had large client groups so it came up

24       often.

25   Q   Just so I have it right, are you saying you were
```



```
 1        terminating someone roughly once a month or more or less

 2        often than that?

 3    A   Probably once a month.

 4    Q   And when I say "you," I mean you were involved?

 5    A   Correct.

 6    Q   And then you said you were also involved in disciplines.

 7        How frequently were you involved in employee disciplines

 8        short of termination?

 9    A   For my client group, I would get involved at the point

10        of a performance improvement plan.  So I would review

11        those and occasionally would sit in on them, but not

12        often, when they were being delivered by the manager to

13        the employee.

14    Q   And were you involved in any lower-level disciplines

15        other than performance improvement plans?

16    A   Sometimes, not all the time.

17    Q   What would be an example?

18    A   Like a structure development plan.  Occasionally, I

19        would review those if the manager needed assistance or

20        help writing them.

21    Q   Okay.  So would you say Amazon was a pretty tough place

22        to work?

23    A   I think Amazon is great for the right person and

24        personality.  It is a challenging place to work and some

25        people thrive on that challenge.
```



Farr vs. Amazon.com.kydc                          Katie Gannon 01/08/2016

```
 1   Q   And when you say -- well, let me ask this:  What were
 2       your hours like at Amazon?
 3   A   It depended on the time of year.  Most of the time, I
 4       worked probably about 50 hours a week.  During peak
 5       season -- our peak for HR was our OLR time period.  So
 6       we would probably in January or February and in August,
 7       when we're doing performance reviews and whatnot, then
 8       it was much higher, maybe 60 to 70.  That was just two
 9       periods of time during the year though.
10   Q   So 50 for most of the time --
11   A   Yeah.
12   Q   -- and then during certain seasons 60 to 70?
13   A   Yeah.  Yes.
14   Q   What kind of hours are you working now?
15   A   I'm working 40 hours a week.
16   Q   Is it safe to say you prefer that?
17   A   Yes.
18   Q   And when you were at Amazon, what was your shift?
19   A   Because of the traffic I came in later, I usually
20       started around 9:30.  I would typically leave the office
21       between 6:00 and 7:00 and, if I needed to, would log in
22       from home in the evenings.
23   Q   So you would take work home with you on a regular basis?
24   A   Yes.
25   Q   And when you logged in, did you use a VPN?
```



```
 1   A   Yes, I did.

 2   Q   And that allowed you to access Amazon's computer system

 3       as if you were in the office; is that right?

 4   A   Correct.

 5   Q   And was being able to work from home your primary use of

 6       the VPN?

 7   A   Yes.

 8   Q   Other than working from home, did you have any other

 9       occasions when you would use your VPN during your time

10       at Amazon?

11   A   I traveled for business and I would use it on travel.

12       So if I would travel to a fulfillment center, I would

13       use it in the hotel.  If I was out of town or

14       something -- any time I wasn't at the office and I

15       needed to log in, I used, my VPN access.

16   Q   So you're saying if you were on vacation or something

17       like that, you could still check in?

18   A   I could still check in.

19   Q   How often did you have to travel for Amazon?

20   A   In the HRBP role, I traveled about six times a year.

21       About.

22   Q   Okay.  And then you said "the HRBP role," was there a

23       prior role?

24   A   Yes.

25   Q   What was the prior role?
```



```
 1    A   I was on the leave of absence and accommodations team.

 2    Q   Okay.  And what was your compensation on the LOA team?

 3    A   When I first came to Amazon, it started at 59.  And when

 4        I ended in that role I was in the low 60s.  I don't

 5        recall exactly at what rate.

 6    Q   So you were salary?

 7    A   Yes.

 8    Q   Did you have a VPN that you used while you were with the

 9        LOA team?

10    A   Yes, I did.

11    Q   And did you use it primarily from home?

12    A   Yes.

13    Q   Did you travel with the LOA team?

14    A   I did occasionally.

15    Q   How frequently did you travel with the LOA team?

16    A   I went to conferences probably twice a year while I was

17        on that team.

18    Q   Okay.  And what were your hours like as a member of the

19        LOA team?

20    A   When I first started, it was about 45 hours, and it

21        increased over the years.  When I left, we were probably

22        at -- I was probably at a minimum of 60 hours a week on

23        the LOA team.

24    Q   Okay.  And when you were working away from the office,

25        did you ever record your time?
```



```
 1   A   No, I was exempt.

 2   Q   Okay.  Have you ever worked in a place as demanding as

 3       Amazon, in terms of time?

 4   A   No.

 5   Q   So I'm going to ask you a couple of questions about

 6       HRAs.

 7   A   Okay.

 8   Q   And tell me, if you know, am I correct that Amazon tries

 9       to limit the amount of time and the amount of overtime

10       that HRAs are allowed to work?

11   A   That's correct.

12   Q   So am I right that HRAs are generally told they can only

13       work 40 hours a week and that gets bumped up some during

14       peak season?

15   A   Correct.

16   Q   But, nevertheless, they are expected to get the work

17       done to meet Amazon's high standards; right?

18   A   I would say they are expected to work at an efficient

19       capacity within the hours that they are expected to

20       work.  And if they need more time to complete their

21       work, that would be a discussion they would have had

22       with their manager.

23   Q   In your experience, do you have a sense of how many HRAs

24       there are that would typically staff a fulfillment

25       center on a given, let's say, day shift?
```



1   A   I wouldn't be able to speculate that.  Each building is

2       so different in size and has different models, I think.

3       So I'm not sure.

4   Q   Okay.  I guess in fulfillment centers that you have

5       seen --

6   A   Uh-huh.

7   Q   -- what would be typical?

8   A   Two to four.

9   Q   On a given shift?

10  A   No, per shift, probably one to three.  I don't know.

11      It's hard to say --

12  Q   Okay.

13  A   -- specifically.

14  Q   Day shift would be more than nightshift?

15  A   Day shift would be more than nightshift, yes.

16  Q   Are you familiar with what a new hire orientation

17      involves?

18  A   Within the HR organization, yes.  At the fulfillment

19      center, no, I never sat in on one of those.

20                  MR. COPETAS:  Okay.  I'm going to ask the

21      court reporter to hand you an exhibit.  Laura, would you

22      please give Ms. Gannon the exhibit that I had marked

23      Exhibit No. 1.  And there is a copy there for Sadhna as

24      well.

25



```
 1              (Exhibit No. 1 marked for identification.)
 2      BY MR. COPETAS:
 3   Q  This is an e-mail from Bridget Rolfes to you dated
 4      12/29/2014.  Can you take a moment to look at the
 5      document and tell me if you recognize it.  I will tell
 6      you that the e-mail to you starts on the
 7      second-to-the-last page of the exhibit.
 8   A  Okay.
 9   Q  Do you recognize this document?
10   A  I do.
11   Q  Prior to receiving this exhibit on December 29, 2014,
12      had you ever heard of Christy Farr?
13   A  I had heard the name, yes.
14   Q  In what sense?
15   A  She had been a longer-term Amazon employee in a group in
16      which I supported.  So her name often came up on reports
17      or spreadsheets.  I recognized the name for sure.
18   Q  Okay.  Did you have a sense of whether she was a good
19      employee or a bad employee or no sense?
20   A  No sense.
21   Q  Okay.  And did you have an idea how long she had been
22      with the company?
23   A  Not exactly, no.
24   Q  But you had a sense that she was a longer-term employee?
25   A  Right, because I had recognized the name from my tenure
```



```
 1       there.

 2   Q   Okay.  Did you ever, prior to December 29th, have an

 3       opportunity to review any documents relating to her

 4       performance at Amazon?

 5   A   I don't believe so.

 6   Q   And were you aware that she had taken significant

 7       amounts of FMLA time during 2014?

 8   A   I was not aware of that.

 9   Q   If you can look at page -- it's the last page of the

10       exhibit, 312, there are numbers marked at the bottom.

11   A   Okay.

12   Q   The very last paragraph, Ms. Rolfes says to you, "I have

13       partnered with the HRM, RHRM, and GM at the site and

14       they are all aligned with termination of the associate.

15       I would like to make you aware and get your alignment as

16       well"; correct?

17   A   Yes.

18   Q   So Bridget is looking for you to approve this

19       termination decision; is that fair?

20   A   Yes.

21   Q   And are you acting as sort of an independent evaluator

22       based on the facts that she is giving you?

23   A   Correct.

24   Q   You're operating under the assumption that the facts

25       that she is giving you are true; is that correct?
```



1   A   Of course.

2   Q   You're not doing things independently to verify them

3       away from her, you're taking it on faith that she's

4       being truthful with you?

5   A   Yes.  I was not the lead investigator in this

6       investigation, so no.

7   Q   Okay, so the lead investigator would have been

8       Ms. Rolfes herself; is that right?

9   A   Yes.

10  Q   Okay.  And in that last paragraph, she tells you she

11      partnered with the HRM, RHRM, and GM.  Did you know who

12      those people were?

13  A   I would have to look them up but, yes, I knew who she

14      was referring to once I had this e-mail and was able to

15      look in the system to see who the GM was and regional HR

16      manager was.

17  Q   Just for the record, who were those people?

18  A   I don't recall their names at this time.

19  Q   Okay, that's fine.

20  A   Yeah.  There was a lot of people.

21  Q   Looking back at the beginning of the e-mail on page 311,

22      she begins by saying, "Please see the attached

23      statements and investigation/termination summary

24      regarding a high-risk situation involving

25      HRA Christy Farr at CVG1."  Did I read that correctly?



```
 1   A   Yes.
 2   Q   Do you recall whether she actually gave you the
 3       investigation summary and witness statements?
 4   A   Yes, she did give me those things.
 5   Q   So you recall actually seeing the investigation summary
 6       and handwritten witness statements?
 7   A   Yes, I reviewed everything that she sent in the
 8       attachments.
 9   Q   I was looking at the e-mail here and, you know,
10       typically when there are attachments to an e-mail it
11       indicates that on the e-mail and it doesn't seem to
12       indicate that here.  Can you take a look at the e-mail
13       and tell me if I'm wrong about that, if it indicates --
14   A   Sure.
15   Q   That there are attachments?
16   A   Yeah.  I can't tell from what's in front of me if there
17       is an attachment.
18   Q   Am I right that typically there is something that
19       indicates that there are documents attached, it will say
20       "attachments on the e-mail," won't it?
21   A   I'm not sure once it's printed out if it does that or
22       not.
23   Q   Okay.  Do you know if there was another e-mail that she
24       might have sent separately with the attachments or is
25       this the only one that kicked it off?
```



```
 1   A   That was definitely the one that kicked it off, but I
 2       don't recall if there was subsequent messages that came
 3       in or not.
 4   Q   You don't remember if she sent a subsequent e-mail that
 5       said, Whoops, I forgot to include the attachments, here
 6       you go?
 7   A   Yeah, I don't remember that.
 8   Q   Okay.  Do you remember how many witness statements there
 9       were?
10   A   I believe there were -- there was one from Christy, one
11       from the front desk, the HR desk of a person who was
12       standing there during the situation, and then one from
13       the SMX employee that I can remember.
14   Q   Do you recall whether there were two statements from
15       Christy or was there -- are you sure there was just one?
16   A   I'm not sure.
17   Q   Okay.  You don't recall seeing one statement or do you
18       recall seeing one statement on a form and another
19       statement on a piece of notebook paper or yellow pad
20       paper?
21   A   I don't recall.  I definitely recall receiving one on
22       the form, but I don't recall if there was a second.
23   Q   Okay.  Looking at the second sentence of the e-mail from
24       Ms. Rolfes to you, it says, "On December 11th, 2014,
25       HRA, Christy Farr, gave SMX coach, Ryan Richardson
```



Farr vs. Amazon.com.kydc                           Katie Gannon 01/08/2016

```
 1      approval to let a terminated SMX associate into the
 2      building to use the rest room."  Did I read that
 3      correctly?
 4   A  Yes.
 5   Q  So this is Bridget telling you the reason for the
 6      termination; is that right?
 7   A  Correct, for -- the request for termination.
 8   Q  Right.  She is telling you this is the reason I'm
 9      requesting the termination?
10   A  Yes.
11   Q  And so she is saying Christy gave this guy Ryan approval
12      to let a terminated associate into the building; right?
13   A  Yes.
14   Q  And that's a no-no at Amazon; is that right?
15   A  Correct.
16   Q  You're never supposed to let a terminated associate into
17      the building; is that fair?
18   A  Not just terminated.  Security is so strict, even an
19      active employee who didn't have their badge would need
20      to go through hoops to get into the building.
21   Q  And you're not supposed to let someone who is not even
22      an employee at all in the building; right?
23   A  Right.
24   Q  And the reasons for those are all the same; is that fair
25      to say?
```



Central Court Reporting   800.442.3376

```
 1   A   Yeah, for security.  Uh-huh.

 2   Q   Okay.  If you could look at the last bullet point that's

 3       on page 311.

 4   A   Okay.

 5   Q   It says, "The terminated associate was escorted to the

 6       rest room at the start of the shift for Outbound

 7       department.  While reviewing vision, the associate was

 8       upset and was shoving associates out of the way."  Is

 9       that correct?

10   A   You froze, and so --

11   Q   I will back up and try again.

12   A   Sorry.

13   Q   That's okay.

14   A   Skype.

15   Q   Yeah, we may have a hiccup or two.

16   A   Okay.

17   Q   So I was just asking, that last bullet point says, "The

18       terminated associate was escorted to the rest room at

19       the start of the shift for the Outbound department.

20       While reviewing vision, the associate was upset and

21       shoving associates out of the way; right?

22   A   Yes.

23   Q   And so this sounds pretty serious, right, if you've got

24       a terminated associate in the building shoving people;

25       is that fair to say?
```



```
 1   A   Yes.

 2   Q   Did you ever see the video?

 3   A   I did not see the video.

 4   Q   Did you ever ask to see the video?

 5   A   I don't recall if I asked to see the video.

 6   Q   So I guess you would expect that Amazon would keep the

 7       video that shows something serious like this; right?

 8   A   I knew that Amazon had video cameras, but it doesn't

 9       save forever.  And so if somebody doesn't put a hold on

10       it, then it doesn't get saved.

11   Q   Understood.  But with a terminated associate in the

12       building shoving people out of the way, you would think

13       this is something that Amazon would want to put a hold

14       on; right?

15   A   That wouldn't be my call to make.

16   Q   If it were your call to make, would you put a hold on

17       that, in case any associate got hurt from the shoving or

18       anything like that?

19               MS. TRUE:  Objection, calls for

20       speculation.

21               MR. COPETAS:  You can answer.

22               THE WITNESS:  I guess.

23   BY MR. COPETAS:

24   Q   Look at the last full paragraph on page 312.  Do you see

25       where it says, "This HRA has a history of making poor
```



1    decisions resulting in risk to the associates and the

2    company, (I-9 completion issues, new hire paperwork,

3    continued associate complaints)."  Do you see where I'm

4    referring?

5  A  Yes, I do.

6  Q  And so am I right that this information helps paint a

7    picture for you as far as what contributed to why

8    Ms. Rolfes wanted to terminate Christy?

9  A  Actually, no.  When I received this, I was solely

10    focused on the policy violation and didn't take into

11    account her history as noted in this document because I

12    had not been involved in any of those conversations.

13    But the security violation was enough to move forward

14    with.  One didn't have to do with the other, so I only

15    focused on one.

16  Q  Okay.  If one didn't have to do with the other, why did

17    Ms. Rolfes tell you that, do you know?

18  A  I don't know.

19  Q  I guess in evaluating the situation, like I said before,

20    you're assuming that what she is telling you is true,

21    right, that Christy did indeed have a history of making

22    poor decisions, continued associate complaints, and so

23    forth?

24  A  I really didn't take that into account when reviewing

25    this.  I assumed that anything Bridget told me would



```
 1      have been accurate to the best of her knowledge, but it

 2      didn't -- it didn't -- to me, her history of that didn't

 3      matter after the breach in security.

 4   Q  And, again, breach of security was her saying, You can

 5      let the terminated associate in the building?

 6   A  Correct, giving permission to do that.

 7   Q  Right.  And I guess if Christy did have a history of

 8      poor decisions and continued associate complaints, you

 9      would expect there to be some documentation of that;

10      correct?

11   A  Correct.

12   Q  Well, let me do this:  Let's go back to the top of the

13      e-mail to you on page 311.

14   A  Okay.

15   Q  It looks like you received this at 10:39 a.m. on

16      December 29th; correct?

17   A  Looks like it.

18              MR. COPETAS:  I'm going to ask -- Laura,

19      would you hand Ms. Gannon a copy of the document.

20          (Exhibit No. 2 marked for identification.)

21      BY MR. COPETAS:

22   Q  Ms. Gannon, would you take a moment to review?

23   A  Yes.

24   Q  Let me know when you are ready, Katie.

25   A  Okay.  I'm ready.
```



```
 1   Q   Okay.  Do you recognize this document?

 2   A   I do.

 3   Q   And is this an e-mail that you sent to yourself?

 4   A   Yes, this is the way I would take notes when I was on

 5       the phone with people.

 6   Q   And would you do this -- so this is an e-mail that you

 7       just addressed to yourself, then take notes and then

 8       send it to yourself so you have a record?

 9   A   Not necessarily so I have a record.  I didn't like to

10       handwrite notes, I liked to type my notes.

11   Q   Okay.  And this wasn't a OneNote document, this was an

12       e-mail?

13   A   Right.  Yeah.  I didn't use OneNote at the time.

14   Q   Okay.  And these are notes of your conversation with

15       Bridget Rolfes about the decision to terminate

16       Christy Farr; is that right?

17   A   Correct.  These were taken while I was on the phone with

18       her.

19   Q   Okay.  So this is contemporaneous with your conversation

20       you are typing?

21   A   Correct.

22   Q   And then once the conversation is over, you just click

23       "send"?

24   A   Yes.

25   Q   And you've got your notes?
```



```
 1   A   Yeah.

 2   Q   And so this conversation that you had with Bridget was

 3       in follow-up to the e-mail that she sent you earlier

 4       that we marked as Exhibit 1; is that right?

 5   A   Yes.

 6   Q   Do you recall whether you had a chance to thoroughly

 7       read the investigation summary and witness statements

 8       that Ms. Rolfes had sent you?

 9   A   Prior to the phone conversation?

10   Q   Yes.

11   A   I don't recall the order.

12   Q   Are you sure that you had the investigation and witness

13       statements before the phone call or might you have had

14       them after or you don't know either way?

15   A   I'm not sure either way.

16   Q   Okay.  And I understand that you weren't taking a

17       word-for-word transcript of the call.

18   A   Correct.

19   Q   Do these notes accurately reflect your conversation with

20       Ms. Rolfes?

21   A   Yes.

22   Q   Do you remember if she called you or you called her?

23   A   I am not sure.

24   Q   But I guess the call is taking place as part of getting

25       your alignment to the termination; right?
```



```
 1   A   Right.  I needed to gather some additional information
 2       and talk to her after receiving that e-mail.  So I would
 3       have scheduled time to chat with her.  I'm not sure
 4       which way the call went, though, if it was to me or from
 5       me.
 6   Q   Okay.  In the second paragraph there of the e-mail you
 7       write, "Poor decision-making over the last six months."
 8       Do you see that?
 9   A   Yes.
10   Q   Do you recall if she gave you any examples that she
11       discussed?
12   A   No, I don't recall if we had specific examples.  I think
13       if she would have I would have written them down, but
14       that wasn't the main reason for the call so I didn't
15       dive too much into that.
16   Q   Okay.  But you were assuming that she was being honest
17       that Christy did engage in poor decision-making?
18   A   Yeah.
19   Q   And she also tells you there were constant associate
20       complaints?
21   A   Uh-huh.
22   Q   What did you understand that to mean?
23   A   In the fulfillment centers there are white boards or
24       chalkboards that associates are allowed to write
25       whatever they want on if they have a problem, and it is
```



```
 1       a process that those are read by management within the
 2       building and addressed.  And so I understood that to
 3       mean that Christy specifically had callouts or
 4       complaints from associates directed to her or because of
 5       her.
 6    Q  And when management takes in these complaints, do they
 7       write them down, make a record of them?
 8    A  I believe so, yeah.
 9    Q  Okay.  And she said "constant associates complaints,"
10       you understood this to mean more than just one
11       complaint; right?
12    A  Yes.
13    Q  And probably more than two or three over the last six
14       months; right?
15    A  Well, I don't know what Bridget's definition of
16       "constant" is, but I would assume it to mean more than
17       one.
18    Q  And so I guess let me put it this way -- and I'm asking
19       for your understanding --
20    A  Uh-huh.
21    Q  This made you understand that she had a number of
22       complaints where it became a recognized problem?
23    A  Correct.  I was writing down what Bridget was informing
24       me at the beginning of that call.  But, again, my focus
25       was about the security breach, not about her --
```



```
 1   Q   Understood.

 2   A   Yeah.

 3   Q   I'm just trying to get your understanding of what she is

 4       telling you.

 5   A   Okay.

 6   Q   So am I right; your understanding is there is a level of

 7       complaints about Christy that it's a problem if it's

 8       constant associate complaints?

 9   A   Yes.

10   Q   And then the next line do you see where it says

11       "Discussion with her ongoing.  Last month - if we

12       continue to see trend, she is trending toward SDP."  Do

13       you see that?

14   A   Yes.

15   Q   What is an SDP?

16   A   An SDP is a Structured Development Plan.  It's a tool

17       that's used for coaching.

18   Q   Okay.  Describe that a little more.  What exactly is it?

19   A   Sure.  It's a tool that Amazon uses for coaching

20       individuals who are not meeting expectations, where

21       there can be some more structured one-on-one time

22       between employee and manager to work over a period of

23       time determined within the SDP to just better their

24       performance.

25   Q   And what might be a typical period of time that SDP
```



```
 1      might be in effect for?

 2   A  30 to 60 days.

 3   Q  And the SDP would be shared with the employee; correct?

 4   A  Yes.

 5   Q  Can you give me a sense of when you think it's

 6      appropriate to put an employee on a Structured

 7      Development Plan?

 8   A  I think it would be appropriate to place an employee a

 9      Structured Development Plan if there were issues with

10      their performance and the manager wants to provide them

11      with tools and resources to help them better their

12      performance.  It would probably be after a coaching

13      conversation or just like a structured one-on-one

14      conversation.

15   Q  So she then says, "Did provide her a structured plan."

16   A  Uh-huh.

17   Q  "Improved and then regressed during peak."

18   A  Uh-huh.

19   Q  Did you understand that to mean just what it sounds

20      like, that Ms. Rolfes put her on a Structured

21      Development Plan that resulted in improved performance

22      before a drop-off during peak?

23   A  I understood that to mean that she had been working with

24      her and coaching her verbally and put her on a plan

25      saying, you know, We're going to work on this together,
```



```
 1      let's try to increase your performance here or there.
 2      And she did see -- Bridget saw some initial improvements
 3      and then told me during peak she kind of went downhill
 4      again.
 5   Q  Are you suggesting that a structured plan is something
 6      different than a Structured Development Plan?
 7   A  Structured Development Plan is a document.  Me writing a
 8      structured plan isn't a document, it's just that she has
 9      been spoken to verbally about her performance in areas
10      she needs to improve.
11   Q  Have you ever given somebody a structured plan that is
12      short of a Structured Development Plan?
13   A  Yes.
14   Q  Who?
15   A  I don't have exact examples, but lots of times we had
16      verbal conversations and plans to increase people's
17      performance before it got to the legal of an SDP.
18   Q  And in all of those circumstances, it's called a
19      structured plan?
20   A  It could be called a one-on-one, it could be called a
21      structured plan, it could be called a coaching session.
22      These are just my quick, while I'm writing notes.
23   Q  I get a one-on-one.  That sounds kind of unstructured;
24      right?  It's just a meeting, one-on-one we'll talk about
25      things?
```



```
 1   A   So for more a serious -- for a more serious situation it
 2       would be sit down, you need to improve, or we're going
 3       to move in a different direction.
 4   Q   And that would be documented; is that fair to say?
 5   A   The coaching conversation would be documented?
 6   Q   Well, I want to make sure we're talking about the same
 7       thing.
 8   A   Yeah.
 9   Q   I'm talking about a structured plan.  You would expect
10       that to be documented; right?
11   A   I always coach my managers to document their
12       conversations in one-on-ones with employees.
13   Q   And so I'm just trying to understand.  A structured plan
14       is something more involved than just a coaching
15       conversation; right?
16   A   Not necessarily.  A Structured Development Plan is.
17   Q   Okay.  What about a coaching conversation -- why would
18       you call it structured -- what is structured about that?
19   A   Structured would be they have milestones to meet or I
20       need to see improvement by "X" date.  Or other things,
21       like, You need to reach out to this person to get
22       retrained on this process type of, like, action items
23       for the employee to take to increase their performance
24       and learn their job.
25   Q   Okay.  So if it's a structured plan, it's you're giving
```



```
 1      the employee specific things to accomplish or work
 2      toward?
 3   A  Yes.
 4   Q  And you would then follow up to see, if it's a
 5      structured plan, where the associate is in meeting those
 6      goals?
 7   A  Yeah.  During regular meetings with the manager, that's
 8      where that would take place.
 9   Q  Okay.  And, again, if it's a structured plan where
10      you're giving goals, those would be written so the
11      associate would know what they are?
12   A  Not necessarily.  It would be more of conversational
13      with the manager and the employee during their
14      one-on-one.  Here are some things that -- here are some
15      tools that I can give you to help you get better.  If
16      the manager took notes on that -- like every manager
17      should take notes on those types of conversations, I
18      don't know if she did or not -- but nothing is typically
19      written and given to an employee until it is to the
20      level of an SDP or a PIP.
21   Q  Okay.  So we talked about coaching conversations and,
22      again, I'm a little confused because I guess a -- I
23      guess a coaching conversation is if you see something
24      you don't like you might say to an associate, Don't do
25      that again?
```

```
 1   A   Uh-huh.

 2   Q   But a structured plan is something where you're giving

 3       the associate maybe some affirmative goals?

 4   A   Yeah.  So, for example, you know, If you have missed a

 5       process, here is how you can achieve that, contact your

 6       co-worker and ask for retraining or consider rereading

 7       the policy on Inside Amazon or the instructional

 8       process.

 9   Q   Okay.  And if you look at what Ms. Rolfes wrote to you

10       there, she says, "Did provide her a structured plan."

11                   MS. TRUE:  Objection --

12                   THE WITNESS:  Ms. Rolfes didn't write

13       that, I wrote that to myself just from notes of the

14       conversation.

15   BY MR. COPETAS:

16   Q   Yes, thank you.  So Ms. Rolfes told you that she

17       provided her a structured plan.

18   A   Correct.  That she had been coaching her, uh-huh.

19   Q   Well, that she had given her a structured plan, that she

20       had given her for something; right?  This was more than

21       just, "Stop doing that," this is giving her --

22   A   Telling her how she can improve.  Giving her -- yes.

23   Q   And providing suggestions that she gave her something

24       like a document; right?

25   A   Not necessarily.  It could be instructions, verbal
```



 1      instructions.

 2   Q  Okay.  Prior to this incident on December 29th with

 3      Christy Farr, did you use the term -- can you recall

 4      using the term "structured plan" in a way that was less

 5      than a Structured Development Plan?

 6   A  I don't recall.

 7   Q  Can you think of any examples where you used the term

 8      "structured plan" prior to this as a way -- as something

 9      short of a Structured Development Plan?

10   A  When I would be coaching managers on performance

11      conversations, I often used the word "structure" and

12      make sure there is structure and you have a plan around

13      how to increase this person's performance.  But I don't

14      recall if I have anything specifically noted as

15      structured plan for previous employees.

16   Q  You understand how calling something a structured plan

17      as something differentiated from a Structured

18      Development Plan is kind of confusing; right?

19   A  Sure.

20   Q  And, again, just to make sure we got it, any specific

21      examples you can think of where a structured plan

22      occurred that was short of a Structured Development

23      Plan?

24   A  I can't recall.

25   Q  Okay.  The next line there says, "Quick judgments and



```
 1    bad decisions."
 2        Did you discuss with Ms. Rolfes what she meant by
 3    that?
 4  A No, I was really moving the conversation to talk about
 5    the security breach.
 6  Q Okay.  If you can look -- do you see where it says,
 7    about two-thirds of the way down the page, "Christy was
 8    doing two to three different things at once when she
 9    made the decision to tell Ryan to let her in"?
10  A Yes, I see that.
11  Q Again, you wrote this down because this is what
12    Ms. Rolfes is telling you was the reason she is
13    requesting to fire Christy; right?
14  A Part of that, yeah.
15  Q Part of that, what do you mean "part of that"?
16  A She was requesting to separate Christy because -- yes,
17    because she told Ryan to let the employee into the
18    building.
19  Q The next sentence from the bottom, "There are
20    restaurants right next door with rest rooms."  Do you
21    see that?
22  A Yes.
23  Q So by saying this to you, was it your understanding that
24    Ms. Rolfes was trying to illustrate that, Hey, it would
25    have been no big deal for this terminated associate to
```



1     just use the rest room next door?

2   A  Yes.

3   Q  Okay.  And so your understanding here is -- I guess

4      you're picturing that restaurants were available right

5      there, like, within close walking distance; right?

6   A  Well, any fulfillment center is a giant plot of land, so

7      it would be a walking distance.  But, yeah, not too far

8      away is what I would assume by what she told me.

9   Q  Right.  You're not thinking a half-mile or a

10     quarter-mile or anything?

11  A  I'm not sure.  Depending on the size of the FC.

12     Honestly, those buildings can be a quarter-mile long.

13  Q  Okay.  Let me back up.  So we discussed some of the

14     information that Ms. Rolfes gave you to get your

15     alignment, both in the e-mail that she sent you and in

16     your conversation?

17  A  Yes.

18  Q  And let me make sure I got it right.  So, first, she

19     tells you that the SMX coach -- she tells you that

20     Christy allows the SMX coach -- tells him that he can

21     let a terminated associate into the building; right?

22  A  Right.

23  Q  And she tells you that the terminated associate was

24     upset and shoving associates out of the way on the way

25     to the rest room; right?



```
 1   A   Bridget told me that she saw that from the tape, yes.
 2   Q   Okay.  And she told you that Christy had a history of
 3       making poor decisions resulting in risks to the
 4       associates and the company; right?
 5   A   She did tell me that.
 6   Q   And that there were constant associate complaints about
 7       Christy; right?
 8   A   She told me that, yes.
 9   Q   And that she had ongoing discussions with Christy about
10       her performance problems; right?
11   A   She did tell me that she had addressed them with her
12       before, yes.
13   Q   And that she told you that she had already put Christy
14       on a structured plan, which is something more than
15       just --
16   A   Can you repeat that, sorry?
17   Q   Sure.  Sure.  She also told you that she put Christy on
18       a structured plan, that is more than just a coaching
19       conversation but a structured plan that had structure to
20       it?
21   A   Yes.
22   Q   And believing all these things to be true, you aligned
23       with the termination decision; is that right?
24   A   After this call, I connected with our legal rep and
25       reviewed the information again, and yes, ended up
```



```
 1      aligning with the decision.
 2   Q  And you're saying "legal rep," you mean in-house
 3      counsel, a lawyer for Amazon?
 4   A  Yes.
 5   Q  And if you had learned that the facts that Ms. Rolfes
 6      had given you were not true, if you learned in fact that
 7      they were lies, like maybe she made up the -- what she
 8      told you about the structured plan, you would not have
 9      aligned with the decision, would you?
10   A  I really didn't take anything into account about her
11      performance at work.  When aligning with the decision to
12      separate, it was a hundred percent on giving instruction
13      to allow an employee without a badge into the building.
14   Q  Well, is it fair to say it would have concerned you in
15      aligning with the termination if you learned that
16      Bridget was misrepresenting facts?
17                    MS. TRUE:  I'm going to put a continuing
18      objection on the record.  This is all calling for
19      speculation and hypotheticals.
20      BY MR. COPETAS:
21   Q  Okay.  Ms. Gannon, you can answer.  Do you need me to
22      repeat it?
23   A  Yes, can you repeat it?
24   Q  Yeah, so what I'm saying is, if you found out Ms. Rolfes
25      was lying to you about some of the things she told you,
```



```
 1        that she was -- if she was lying to you about the
 2        associate complaints, and if she was lying to you about
 3        the pushing and the shoving, would that make you
 4        concerned that maybe she was going out of her way to try
 5        to fire Christy?
 6    A   If I knew for a fact that she was lying to me about
 7        those items, yes, I would be concerned with that.
 8        However, with the witness statements and the fact that
 9        the employee was in the building, that's enough.
10        Because Amazon's security was so strict, that's enough,
11        period.  Whether it was a mistake or not a mistake or
12        whether Bridget -- it's enough to terminate somebody.
13    Q   Okay.  You mean, letting somebody in a building?
14    A   Giving permission to -- as an HR employee, our HR
15        employees are held to a higher standard, and it's their
16        job to follow policy and make sure the people around
17        them are following policy.
18    Q   Okay.  And what do you recall from the statements, the
19        witness statements?
20    A   From the witness statements, I recall that SMX employee
21        approached the HR desk on the floor and said that there
22        was a terminated employee outside that needed to use the
23        rest room and that person asked another member of HR if
24        that was okay.  That person turned to Christy and asked
25        her opinion, because they didn't know the answer.  And
```

Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 46 of 92 - Page ID#: 451

Farr vs. Amazon.com.kydc                        Katie Gannon 01/08/2016

```
 1        Christy said, Yes, that's fine, as long as she was
 2        escorted.  That's what I recall from those.
 3   Q    Are you aware whether Christy knew that the terminated
 4        associate was outside of the building?
 5   A    Not specifically.  But there would be no reason for
 6        somebody to ask her for permission if the employee was
 7        already inside the building.
 8   Q    Well, if an employee is being terminated and they're
 9        being walked out of the building, which sometimes
10        happens; right?
11   A    Uh-huh.
12   Q    And they asked to use the rest room before they left the
13        building, there wouldn't be anything wrong with
14        escorting them to the rest room and letting them use the
15        rest room, would there?
16   A    No, there wouldn't, but there would be no reason to get
17        permission from an HR rep to do that.
18   Q    Well, this was an SMX coach.
19   A    Right.
20   Q    So --
21   A    So it's an SMX and an SMX employee, if they were
22        separating them and walked them by the bathroom, there
23        would be no reason for them to go seek out HR's approval
24        to do that.
25   Q    Okay.  But if she sought HR's approval, it would be fine
```



```
 1      for them to use the rest room?
 2   A  If they sought HR's approval and they still had an
 3      active badge, yeah, it would be fine for them to use the
 4      rest room.
 5   Q  Well, why would it matter if their badge was active?
 6   A  Because you're not allowed with an inactive badge into
 7      the building.
 8   Q  Okay.  Just to simplify things, you're walking a
 9      terminated associate out of the building --
10   A  Uh-huh.
11   Q  -- and you ask an HR person, They want to use the rest
12      room, can I allow them to use the rest room before they
13      go, you would want the -- you would want the person to
14      be escorted to the rest room, you wouldn't want to just
15      say, Just let them go; right?
16   A  That's correct.
17   Q  If you checked with HR on that, it would be okay, and
18      the HR person would say, Yes, as long as they are
19      escorted, escort them back and forth to the rest room?
20   A  Yes.  But, again, if they were approaching HR, our
21      expectation would be that they inquire, Why are you
22      asking my permission for this?  There was just no reason
23      why they would have needed to ask her permission for it
24      if they were already in the building.
25         Security wouldn't have had them outside the --
```



Farr vs. Amazon.com.kydc                              Katie Gannon 01/08/2016

```
 1       outside the security badge area.  If they were already
 2       termed, they would have termed them inside if they were
 3       doing that.
 4   Q   So if they were outside the building, security shouldn't
 5       have let them in in the first place, should they?
 6   A   Security can let someone into the security desk while a
 7       situation is being questioned or looked into, but they
 8       can't go past that.
 9   Q   So security shouldn't have let them past the security
10       turnstiles?
11   A   They could have if they were investigating.
12   Q   If who was investigating?
13   A   If security is looking into who is this person, are they
14       active, are they not active, did they forget their
15       badge, or what's the situation?  They would find all
16       that information out.
17   Q   Okay.  But security should never allow one employee to
18       badge another employee in?
19   A   Oh, never.  Yeah, they should not allow that.
20   Q   Right.  So, given that, why would an HR employee assume
21       that anyone would ask permission to let somebody outside
22       in, when security would never have let them in in the
23       first place?
24   A   Right.  She should have asked more questions and found
25       out what was going on because that shouldn't have --
```



Central Court Reporting   800.442.3376

```
1   Q  Right.

2   A  Another employee should never badge another person into

3      the building.

4   Q  And security should not have let that happen in the

5      first place; right?

6   A  Security can do that with HR or management approval.

7   Q  Where do you get that?

8   A  HR sometimes has people come in, and if they have

9      approval to be let into the building then they can be

10     badged in as a visitor badge, sign in, all of that

11     stuff, and go to a meeting or whatever.

12  Q  Right.  And there is a procedure for that where they're

13     issued a visitor badge or a vendor badge; right?

14  A  Right.  Yeah.  Uh-huh.

15  Q  But security should never, under any circumstance, allow

16     an SMX coach to badge another employee in using his own

17     badge; right?

18  A  I don't believe so.

19  Q  So it's sort of like there is another step that failed;

20     security should not have done what they did?

21  A  There were many steps that were failed in that

22     situation.

23  Q  Am I correct that one of them is that security should

24     never have allowed the SMX coach to badge the associate

25     in; right?
```



```
 1   A   Unless security was told that HR said it was okay.

 2   Q   Really?  Because that's a little different than what I

 3       think you just told me, Ms. Gannon.

 4           You're saying that security, if an SMX coach goes up

 5       to security and says, Hey, HR told me it was okay, I can

 6       badge him in, security should be okay with that?

 7   A   They should hear from someone directly in HR.  But if

 8       they didn't, then, yeah, there would be another gap in

 9       the --

10   Q   Right.  So that's another way of you telling me security

11       should not have let this happen, right, unless they

12       heard directly from HR?

13   A   Right.

14   Q   Okay.  You said there were a number of things that

15       failed, what else failed?

16   A   The SMX coach badging the person in failed.  That

17       shouldn't have happened.

18   Q   So SMX coaches are trained on Amazon policy; right?

19   A   Correct, on the security policy.

20   Q   And SMX coaches are trained that there is no

21       circumstance where they should badge -- where they

22       should let somebody in using their own badge?

23   A   I believe so.  I haven't attended an SMX training, but I

24       believe that would be something that should be covered.

25   Q   It's a hard-and-fast Amazon rule that you don't use your
```



```
1      badge to let someone else in the building; right?
2   A  Right.  Right.
3   Q  That there are no circumstances where that's okay?
4   A  Not that I can think of.
5   Q  Okay.  Let me ask, Ms. Gannon, prior to this
6      deposition -- well, did you do anything to prepare for
7      this deposition today?
8   A  I met with Sadhna yesterday.
9   Q  Anyone else?
10  A  Our internal -- Amazon's internal legal counsel,
11     Catherine Thompson.
12  Q  So you were in a meeting with Sadhna and Ms. Thompson?
13  A  Yes.
14  Q  How long did you guys meet?
15  A  Two hours, I think.  Yeah, two hours.
16  Q  Did you review documents during that meeting?
17  A  The documents they provided me, yes.
18  Q  Okay.  And, I'm sorry, you broke up a little.
19  A  Okay.
20  Q  I asked you if you reviewed documents prior to that or
21     during the meeting, and you said the documents they
22     provided you?
23  A  Yes.
24  Q  Which documents would be those?
25  A  Some e-mails, these two that you provided me as well.
```



Case: 2:15-cv-00064-WOB-JGW  Doc #: 43-1  Filed: 06/29/16  Page: 52 of 92 - Page ID#: 457

Farr vs. Amazon.com.kydc                        Katie Gannon 01/08/2016

```
 1   Q   What e-mails?

 2   A   The e-mail from myself to myself.  And the e-mail from

 3       Bridget to me, in Exhibit 1, they showed me this one.

 4   Q   Any others?

 5   A   Some that were between me and Catherine that were

 6       privileged.

 7   Q   Did you review the investigation summary?

 8   A   The investigation summary of what Bridget wrote in this

 9       e-mail?

10   Q   No, the investigation summary that she said was attached

11       to the e-mail.

12   A   I don't recall looking at the investigation summary

13       yesterday.

14   Q   Okay.  And do you recall whether you reviewed the

15       witness statements?

16   A   I did.

17   Q   And you reviewed the witness statements of who, do you

18       recall?

19   A   The op admin and the SMX employee and Christy.  I don't

20       remember if I read Christy's.

21   Q   You don't remember if you read Christy's?

22   A   I don't remember.  Sorry.

23   Q   Yeah, and I know you're looking to your --

24   A   I don't know.

25   Q   And all I'm asking you to do is do the best you can from
```



```
 1      your recollection.

 2    A  Yeah.  Probably.

 3              MR. COPETAS:  We've been talking for close

 4      to an hour-and-a-half.  Why don't we take a ten-minute

 5      break, and then we'll pick it back up.  We're probably

 6      not far from being done.

 7              THE WITNESS:  Thank you.

 8              (Short break taken.)

 9    BY MR. COPETAS:

10    Q  Ms. Gannon, do you know if anyone in security was

11      terminated in connection with this incident?

12    A  I am not sure.

13    Q  They should have been; right?

14    A  To my understanding, they alerted the appropriate people

15      when they saw the person -- when they saw the SMX person

16      badge-in the terminated associate.  So I don't know that

17      process.  That's not my client group.  I didn't deal

18      with that at all.

19    Q  Am I correct that the way you understood the facts,

20      security allowed the SMX coach to badge the terminated

21      employee into the building?

22    A  They did allow that, yes.

23    Q  And they should not have; right?

24    A  Well, they needed to find out more information, and so

25      that would have been their role to figure out the reason
```

Case: 2:15-cv-00064-WOB-JGW  Doc #: 43-1  Filed: 06/29/16  Page: 54 of 92 - Page ID#: 459

Farr vs. Amazon.com.kydc                          Katie Gannon 01/08/2016

```
 1      the person needed to be in the building or not.
 2   Q  You're saying that they, like Christy, should have found
 3      out more information?
 4   A  The person who allowed the terminated employee into the
 5      building and security, there needed to be a conversation
 6      about why this person needed to be in the building, and
 7      Christy was a part of that or ended up being a part of
 8      that conversation, but I don't know if that security
 9      personnel was fired or not.
10   Q  Right.  And I'm just making sure we got it.
11   A  Yeah.
12   Q  Security sat there and watched this SMX coach badge this
13      person into the building using his own badge?
14   A  I believe that's what happened.
15   Q  And that's a no-no, right, you never do that?
16   A  Unless there is some reason that person needed to be in
17      the building, in which they would get that information
18      from, you know, HR or management or they would ask
19      questions and find out more information.
20   Q  Right.  So security dropped the ball here, they should
21      not have just -- it should not have been okay for the
22      SMX coach to just say, Hey, it's okay, HR told me it was
23      okay, I can let her in, and they should have stopped
24      that; right?
25   A  They should have began asking questions and having that
```



 1      conversation to find out why is this person in the

 2      building and then alerted the appropriate people if that

 3      person shouldn't have been in the building.

 4   Q  Again, it's never okay to use your badge to let someone

 5      in the building, right?

 6   A  Sorry, you were cutting out a little bit.

 7   Q  Because security knows that there is no circumstance

 8      where it's okay for an employee to use their own badge

 9      to let someone in, you've got to go through the other

10      process; right?

11   A  Right.  You need to ask the question, Why does this

12      person need to be in the building?  There are times when

13      somebody needs to be let into the building, maybe they

14      have a meeting at the building, maybe -- you know --

15   Q  Right.

16   A  But they need to ask the questions and have the

17      conversation in order to make the right decision.

18   Q  And if that's the case, then the SMX coach should never

19      be allowed to use his own badge, he should go through a

20      process to get a vendor badge or a visitor pass or

21      something like that; right?  Security should have never

22      let him use his own badge?

23   A  That particular process I'm not a hundred percent on

24      because I was never in that role or in that area.

25      But --



```
 1   Q   Ms. Gannon, are you aware of any circumstance where it's
 2       ever okay to use your own badge to let another employee
 3       in the building?
 4   A   No.  Security would be different, I believe, but not the
 5       SMX coach.
 6   Q   You believe based on what?  You said security would be
 7       different?
 8   A   Well, if there was a paramedic or police officer,
 9       security could go out and badge that person into the
10       building.  So I can't say, for a fact, never.
11   Q   Okay.  But we're not talking about a paramedic or a
12       police officer here, are we?
13   A   No.
14   Q   We're talking about a terminated employee; right?
15   A   Yes.
16   Q   That security knew was terminated; right?
17   A   I don't know when security realized that employee was
18       terminated.  I don't know the answer to that.
19   Q   Well, let's go back.
20   A   Okay.
21   Q   If you can look at Exhibit 2, please.
22   A   Okay.
23   Q   Do you see the fifth paragraph down where it says, "She
24       found out when she got to the building.  Her badge
25       didn't work.  Security contacted SMX and Ryan talked to
```



1    the associate and explained that she had been termed"?

2  A  Yes.

3  Q  So security knew she was a terminated employee?

4  A  That was -- was Ryan the security guard?  Yes, not the

5     SMX employee?  I remember --

6  Q  Ryan is a coach.

7  A  Okay.

8  Q  But he's right there explaining -- so security knew she

9     was a terminated employee --

10  A  Okay.

11  Q  -- is that right?

12  A  Based on my notes from the conversation with Bridget.

13  Q  Based on that, there is no circumstance where security

14     should have allowed this SMX coach to badge her in using

15     his own badge?

16  A  The SMX coach shouldn't have used his own badge.

17  Q  And security knows that; right?

18  A  And security notified the appropriate people that that

19     had happened --

20  Q  But Ms. Gannon --

21  A  -- when they saw it.

22  Q  You're not answering the question.  Security should have

23     never let it happen in the first place; is that right?

24  A  I don't believe that security is allowed to physically

25     pull him away from what he is doing.



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 58 of 92 - Page ID#: 463

Farr vs. Amazon.com.kydc                          Katie Gannon 01/08/2016

```
 1   Q   Right.  But they should say, No, you can't do that;
 2       right?  They should tell him, that's a no-no, you're not
 3       allowed to use your own badge to let someone in?
 4                 MS. TRUE:  Objection --
 5       BY MR. COPETAS:
 6   Q   It's not a cop and it's not a paramedic; right?
 7                 MS. TRUE:  First of all, Ted, you're
 8       asking a lot of complicated questions, complex questions
 9       and also you're assuming facts not in evidence.  You're
10       assuming the security was able to visualize what
11       Mr. Richardson was doing and was in a position to stop
12       him.
13       BY MR. COPETAS:
14   Q   So answer my question, please, that security should
15       have -- there is no circumstance where security should
16       have allowed an SMX coach to use his own badge to let
17       another employee in?
18   A   They should -- I don't know.
19   Q   You don't know what?
20   A   I wasn't there, so I don't know if they said to him
21       specifically, Yes, go let this terminated person in.
22   Q   Again, you're not answering my question.  My question
23       is:  They should not let him do it; right?
24   A   Verbally?  Physically?  I'm not sure --
25   Q   They should have at least told him, You cannot do that;
```



 1    right?

 2  A  I don't know.

 3  Q  Let me ask it a different way.  And I apologize if I'm

 4     asking this -- again, if you've already answered this --

 5     but can you think of any circumstance where it ever

 6     would be appropriate for security to just allow an SMX

 7     coach to let a terminated employee in using his own

 8     badge?

 9              MS. TRUE:  Objection, asked and answered.

10     And, again, assuming facts not in evidence.

11              MR. COPETAS:  Answer the question, please.

12              THE WITNESS:  There are cases where

13     terminated employees come back and have the appeals

14     process and they're let into the building.

15  BY MR. COPETAS:

16  Q  And that is set up in advance and done through a

17     separate process; right?

18  A  That's correct.

19  Q  Okay.  I'm not asking about that.  I'm saying -- I know

20     you're trying real hard for Amazon today, Ms. Gannon --

21     but is there a circumstance that you can think of, that

22     you can tell me, where it's okay for security to allow

23     somebody to let another employee in using their own

24     badge?

25  A  It's not okay for an employee to use their own badge to

```
 1      allow somebody in.

 2   Q  Period?

 3   A  Unless there is a conversation had and there is a reason

 4      for it.

 5   Q  What could a reason be that would be valid?

 6   A  If somebody had a meeting on site and they needed to

 7      come into the building.

 8   Q  And then what would they do?

 9   A  They would go to the security desk and there would be a

10      conversation and they would find out the reasoning for

11      it and then move forward from there.

12   Q  And moving forward would involve what, issuing a visitor

13      pass; right?

14   A  Yes.

15   Q  Okay.  Not using your own badge to do it?

16   A  Right.

17   Q  Okay.  So we're saying two different things here.

18   A  Okay.

19   Q  Am I right then, that security should never allow

20      someone to use their own badge -- not a visitor pass or

21      anything like that -- to use their own badge to let

22      somebody else in the building?

23   A  In this particular circumstance, no.

24   Q  In any circumstance, you can't use your own badge to let

25      somebody else in, right, Ms. Gannon?
```



```
 1   A   You Should not use your own badge to allow another

 2       employee in, correct.

 3   Q   Are you saying that sometimes it's okay to use your own

 4       badge to let somebody else in?

 5   A   Security should have let that person in to have the

 6       conversation, not the SMX employee with his own badge.

 7   Q   Okay.

 8   A   Does that answer your question?

 9   Q   So I guess you rely on security to address these issues;

10       right?

11   A   Yeah.  Security should be that first line of questioning

12       in the building.

13   Q   Okay.  Ms. Gannon, you testified that you met for two

14       hours with Ms. True and Amazon's counsel.  What did you

15       discuss for two hours?

16               MS. TRUE:  Objection, that's privileged,

17       Ted.  I'm representing Ms. Gannon for purposes of this

18       deposition.

19               MR. COPETAS:  You're representing

20       Ms. Gannon individually?

21               MS. TRUE:  For purposes of this

22       deposition, as a former Amazon HR business partner.

23       BY MR. COPETAS:

24   Q   Okay.  Let me ask, Ms. Gannon, do you have a fee

25       agreement with Ms. True?
```



Central Court Reporting   800.442.3376

```
 1                     MS. TRUE:  Ted, you know she doesn't have
 2        to have a fee agreement with me.
 3        BY MR. COPETAS:
 4     Q  I'm asking her the question:  Do you have a fee
 5        agreement for Ms. True to represent you?
 6     A  No.
 7     Q  Is she your attorney?
 8     A  She was hired on behalf of Amazon to --
 9     Q  Did you hire her?
10     A  I personally did not hire her.
11     Q  Prior to this moment, did you ever discuss with her that
12        she would be representing you as your attorney, as your
13        individual attorney?
14     A  She informed me that she would be here on my behalf,
15        yes.
16     Q  Did she ever say that she was your individual attorney?
17        Did you understand she was representing you as your
18        attorney today?
19                     MS. TRUE:  Again, Ted, I'm not
20        representing her in her individual capacity.  I'm
21        representing her as a former Amazon HR business partner.
22                     MR. COPETAS:  What's the basis for the
23        privilege, Sadhna?
24                     MS. TRUE:  I'm her attorney.
25                     MR. COPETAS:  Are you her attorney right
```

```
 1    now?

 2                    MS. TRUE:  I'm her attorney for purposes

 3    of this deposition.  If you want to challenge it, go

 4    ahead.

 5                    MR. COPETAS:  Yeah.  Well, yeah.  Laura,

 6    if you could mark this for the record.

 7        And just so we're clear, Sadhna, are you instructing

 8    Ms. Gannon not to answer any questions about the

 9    communications that you had with her for two hours prior

10    to this deposition?

11                    MS. TRUE:  That's correct.

12                    MR. COPETAS:  Okay.  Let's just mark that

13    for the record then.

14    BY MR. COPETAS:

15  Q  Ms. Gannon, are you being compensated for your time

16    today?

17  A  No, I'm not.

18                    MR. COPETAS:  Laura, would you hand

19    Ms. Gannon the documents that have been marked with the

20    No. 5.

21        (Exhibit No. 5 marked for identification.)

22    BY MR. COPETAS:

23  Q  Ms. Gannon, do you recognize this document?

24  A  I know what it is, but I haven't reviewed it before.

25  Q  You've never ever reviewed it before in your whole
```

```
 1      career at Amazon?

 2   A  Nope.

 3   Q  Do you understand there is a security policy that

 4      governs the security procedures?

 5   A  Yes, absolutely.

 6   Q  Okay.  Take a moment to review this document and tell me

 7      if you think it accurately depicts Amazon's security

 8      standards of conduct --

 9   A  Okay.

10   Q  -- as you understand them.

11   A  Okay.  Okay.

12   Q  And does this accurately reflect your understanding of

13      what Amazon's policies are with respect to security?

14   A  Within the fulfillment network, yes.

15   Q  And if you look at the first page of that document,

16      under item No. 3, do you see that?  It says, "General

17      Security Guidelines."

18   A  Yes.

19   Q  It says, if you can look at the third bullet point down,

20      am I correct it says, "Never allow another person to

21      enter a secure area using your Amazon-issued

22      identification"; right?

23   A  Yes.

24   Q  Now, Christy did not do that, right, to your

25      understanding?  She did not allow somebody to enter the
```



```
 1      building using her identification?

 2   A  Correct.

 3   Q  And your understanding of the facts is that she did not

 4      tell Mr. Richardson to use his identification to let

 5      somebody in, did she?

 6   A  No.

 7   Q  If you look at the second page, it lists "Category 1

 8      Security Infractions."  Do you see that?

 9   A  Uh-huh.  Yes.

10   Q  Are you familiar with "Category 1 Security Infractions,"

11      what those are?

12   A  High risk, yes.

13   Q  Okay.  Can you identify for me what Category 1 Security

14      Infraction that Christy engaged in?

15   A  I'm not sure.

16   Q  You don't see anything in there that would apply here?

17   A  I don't think so.

18   Q  Let's do this:  Take a look at number -- take a look at

19      item No. 5 on the next page, page 458.

20   A  Okay.

21   Q  And you see where it says, "Category 2 Security

22      Infraction"?

23   A  Yes.

24   Q  Look down at item 5.4.  Do you see where it says,

25      "Allowing visitors access to the facility without an
```



```
 1      escort.  This includes allowing un-vetted contractors to

 2      work without direct escort supervision"?

 3   A  I see that.

 4   Q  Does that kind of more closely approximate what Christy

 5      did?

 6   A  I would say between that and 5.2, having information

 7      about a person involved in a Category 1, and No. 4,

 8      "Allowing visitors access to the facility without an

 9      escort."

10   Q  So you're saying 5.2 and 5.4 more appropriately

11      approximate what Christy did?

12   A  Yes.

13              MR. COPETAS:  If you could, Laura, would

14      you hand Ms. Gannon the document -- hold on one

15      second -- I'm a little out of order.  The document that

16      was marked as No. 3.

17         (Exhibit No. 4 marked for identification.)

18   BY MR. COPETAS:

19   Q  Ms. Gannon, you have been handed what has been marked as

20      No. 4, and this is -- appears to be an e-mail from -- so

21      this appears to be an e-mail from Ms. Rolfes to you on

22      12/30/2014; right?

23   A  Yes.

24   Q  So this is the day after you first became aware of the

25      incident and Ms. Rolfes's desire to fire Christy Farr?
```



```
1   A   Correct.

2   Q   And if you look at that document, am I right that she is

3       asking if she can move forward with the termination on

4       12/30 and then follow up with the termination paperwork

5       later?  Is that what she is asking?

6   A   Yeah.  She is asking if she can move forward the next

7       day without the ticket specifically being completed.  We

8       had a separate team at Amazon that managed our term

9       tickets.

10  Q   Okay.  Is this typical or is it more standard to wait

11      until the terminating supervisor actually has the

12      paperwork?

13  A   It's more typical to wait until they have the paperwork.

14      Typically the exit team wasn't so far behind, but they

15      were during this time period.  They were behind.

16  Q   Okay.

17  A   Because it's a manual ticket, it's a manual process to

18      upload all the documents.

19  Q   Let me ask, looking at the rest of the document, it

20      looks like there is a little over four pages of redacted

21      material.  Do you know what that is?

22  A   I don't.

23  Q   You don't have any idea what's been redacted?

24  A   I really don't.

25  Q   Okay.  What would be the reason for deviating from the
```



```
 1    standard practice here?  Why not just wait until the

 2    paperwork came in?

 3  A I'm not sure what the reasoning would have been.  I

 4    mean, I don't want to speculate.

 5  Q Okay.  You just don't know why Ms. Rolfes wanted to --

 6  A Yeah.

 7  Q This is like putting the cart before the horse; right?

 8  A Right.  I don't know why she wanted to do that.

 9  Q Can you think of any other occasions where you did it

10    this way?  You went ahead and terminated someone, had a

11    termination meeting before the paperwork was ready?

12  A Yes.  I did do that in the past with other terminations.

13    One example was an employee we let go for breaking

14    Amazon policy on site and needed her off the premises.

15    I don't know how much information I'm supposed to give

16    about other employees.

17  Q Well, you're supposed to give me whatever information

18    you have.

19  A Yes, I have termed people without the paperwork done

20    before.

21  Q Okay.

22  A And it happens.  I mean, I don't know how much or I

23    don't have specific numbers for you, but yes.

24  Q Okay.  And the circumstance that you can think of, did

25    the person seem dangerous?
```



1  A  No.

2  Q  Okay.  What was the reason you put the cart before the

3     horse in that other example?

4  A  In the one that comes to mind?  She was intoxicated.

5  Q  Okay.  And that never occurred with Christy Farr to your

6     knowledge; right?

7  A  No.

8  Q  Okay.  Any other examples you can think of where you put

9     the cart before the horse and terminated before having

10    the paperwork ready?

11 A  Yeah, let me think.  Yes, there was another situation

12    where an employee gave misinformation during an

13    investigation, and we separated her employment and

14    provided her with the COBRA and stuff later.

15 Q  Somebody lied during an investigation?

16 A  Uh-huh, that's another situation.

17 Q  And that was grounds for termination?

18 A  Yes.  In that situation it was, yeah.

19 Q  Anything else you can think of?

20 A  Not specifically off the top of my head, but I feel like

21    there is probably more situations where I would have

22    separated someone without all the full paperwork from

23    the exit team being prepared and we would just overnight

24    it to them instead.

25              MR. COPETAS:  Laura, would you hand



```
 1        Ms. Gannon the document I have marked as No. 6.
 2            (Exhibit No. 5 marked for identification.)
 3    BY MR. COPETAS:
 4  Q  And I should have asked this earlier, but who do we have
 5     in the room with you there today?
 6  A  It's Sadhna and Catherine Thompson and Laura and myself.
 7  Q  Okay.  Very good.
 8                    MS. TRUE:  Who is in the room with you,
 9     Ted?
10                    MR. COPETAS:  Just Christy Farr.
11    BY MR. COPETAS:
12  Q  So you've been handed what's been marked as Exhibit 5?
13  A  Yes.
14  Q  And this appears to be an e-mail from Ms. Rolfes to you
15     and Lee Whitley dated 12/30; correct?
16  A  Correct.
17  Q  Do you recall receiving this document?
18  A  Yes.
19  Q  Prior to -- well, I guess let me direct your attention
20     to the -- it's about the sixth or seventh line down.  Do
21     you see where it says, where Ms. Rolfes writes,
22     "Christy did not agree.  She stated that she did give
23     the SMX coach permission to escort the terminated
24     associate to the rest room, but was under the assumption
25     that the associate was in the building"?
```



 1  A  I see that.

 2  Q  Do you see where it says that?

 3  A  Uh-huh.

 4  Q  Prior to receiving this e-mail, had you heard that

 5     explanation before?  Or was this the first time you

 6     recall seeing it?

 7  A  From Christy, did I hear it?  Is that your question?

 8  Q  From anyone.

 9  A  Okay.

10  Q  Was this the first time you became aware that Christy

11     didn't know that the terminated associate was outside of

12     the building?

13  A  Yes.

14  Q  This was the first time you became aware of that

15     explanation?

16  A  I believe so, yes.

17             MR. COPETAS:  Okay.  Laura, would you hand

18     Ms. Gannon the document that has been marked No. 9,

19     which I guess would be Exhibit 6.

20         (Exhibit No. 6 marked for identification.)

21  BY MR. COPETAS:

22  Q  Ms. Gannon, before I ask you any questions about the

23     document you've just been handed let me back up and ask,

24     the termination meeting, you participated in that by

25     phone; right?



```
 1   A   I did.
 2   Q   So am I correct that was a meeting that was between
 3       Christy Farr and Bridget Rolfes?
 4   A   And myself.
 5   Q   And then you were conferenced in by phone?
 6   A   That's correct.
 7   Q   Did you say anything during that meeting or did you just
 8       listen in?
 9   A   I did speak during that meeting.
10   Q   What do you recall saying?
11   A   I don't recall specifically what I said during that
12       meeting, but I was there as Christy's HR business
13       partner representing --
14   Q   Understood.
15   A   Yeah.
16   Q   Other than introducing yourself --
17   A   Yeah.
18   Q   -- and letting Christy know that you were on the
19       phone --
20   A   Uh-huh.
21   Q   -- did you talk about the specific subject of what -- I
22       guess did you contribute anything about the subject for
23       which you were there?  Did you talk about the reason she
24       was terminated?  Or was that all Bridget --
25   A   I believe Bridget drove the conversation.
```



```
 1   Q   And you were mostly listening in?

 2   A   I believe so, yes.

 3   Q   Okay.  Do you recall how long that meeting lasted?

 4   A   I think it was about 10 minutes, maybe 15.

 5   Q   Okay.  The exhibit that you've just been handed, which

 6       has been marked Exhibit No. 6, this appears to be a

 7       Structured Development Plan to Christy Farr from

 8       Bridget Rolfes; is that right?

 9   A   Yes.

10   Q   Have you ever seen this document before?

11   A   I don't believe so.

12   Q   Okay.  So this is the first time you've laid eyes on

13       this, to your knowledge?

14   A   To my knowledge.

15                   MR. COPETAS:  I think we're probably about

16       done.  Give me five minutes to look through my outline

17       to see if there is anything else we need to run by you,

18       but otherwise we may be ready to wrap up here.  Let's

19       take a five-minute break.

20                   THE WITNESS:  Okay.

21                   MR. COPETAS:  Thank you.

22                      (Short break taken.)

23                   MR. COPETAS:  I do not have any further

24       questions.

25                   THE WITNESS:  Okay.
```

```
 1                    MS. TRUE:  I would like to ask a few
 2      questions.
 3                    MR. COPETAS:  If you could go a little bit
 4      the other direction back toward you.
 5                    THE WITNESS:  Back toward me?
 6
 7                         EXAMINATION
 8      BY MS. TRUE:
 9   Q  If you would take a look, Ms. Gannon at Exhibit 5.
10   A  Yes.
11                    MR. COPETAS:  And, Sadhna, let me ask,
12      I've got stuff strewn about a little bit here.
13      Exhibit 5?
14                    MS. TRUE:  This is an exhibit from
15      Bridget Rolfes to Bridget, Katie Gannon, Lee Whitley.
16      It's dated Tuesday, December 30th, '14.
17                    MR. COPETAS:  I've got it.  Thank you.
18      BY MS. TRUE:
19   Q  Is this a recap of the termination meeting that you
20      participated in, Ms. Gannon?
21   A  Yes.
22   Q  And so when you said earlier in response to a question
23      from Mr. Copetas that this is the first time you had
24      heard Christy's explanation of what had happened, were
25      you saying that in the termination meeting that was the
```

```
 1      first time?

 2   A  No.  In the termination meeting Christy stated that she

 3      didn't think that she would do something like that.

 4   Q  And that was the first time you had heard Christy say

 5      that; is that correct?

 6   A  That's the only time I spoke with Christy.

 7   Q  What I wanted to clarify was it sounded like you were

 8      saying that the first time you became aware of that was

 9      when you received the e-mail.  So was it when you

10      received the e-mail or during the termination meeting

11      itself?

12   A  When I received the e-mail.

13   Q  Was the first time you had heard Christy say that she

14      would not do that?

15   A  Oh, no.  That was during the termination meeting, yeah.

16      The part about -- under the assumption that the

17      associate was in the building, that I did not hear

18      during the actual phone call.  She just said, "I don't

19      think I would have done that," a few times.

20   Q  That's your recollection of what Christy said?

21   A  Correct.

22   Q  Okay.  Do you know what security did or did not do on

23      that particular day when the security incident occurred?

24   A  The only thing I know is that they somehow saw or were

25      informed that the SMX person badged in the terminated
```



```
 1        employee and then they notified the proper channels that

 2        that had happened.

 3   Q    And do you know whether security tried to stop

 4        Mr. Richardson or did anything?  Do you have any idea?

 5   A    I don't have any idea.

 6   Q    And in terms of plaintiff's conduct, did her policy

 7        violation occur prior to Mr. Richardson's badging in the

 8        terminated SMX employee?

 9   A    No.  Maybe I don't understand the question.

10   Q    In terms of the sequence of events, what happened first?

11        The conversation between Mr. Richardson and

12        Christy Farr, or his bringing the terminated associate

13        into the building?

14   A    The conversation between the SMX employee and Christy

15        happened first, and then he went back and allowed the

16        employee in the building.

17   Q    So is it fair to say that plaintiff's violation of

18        policy occurred prior to his bringing in the employee?

19   A    Yes.

20   Q    And prior to anything that security did or did not do?

21   A    Correct.

22   Q    Ms. Gannon, do you have any reason to believe that

23        Bridget Rolfes lied to you?

24   A    No.

25   Q    Can you tell us for the record, why did you agree with
```



```
 1        the termination of Christy Farr?

 2   A   After review of the initial investigation that was

 3        handled at the site level by Bridget and review of the

 4        witness statements, I came to the conclusion that I

 5        agreed with the decision to separate employment based on

 6        the policy violation, and I reviewed it with legal

 7        counsel and moved forward.

 8                    MS. TRUE:  That's all I have.

 9                    MR. COPETAS:  I have nothing further.

10             (Proceedings concluded at 11:22 a.m.)

11                  (Signature reserved.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Farr vs. Amazon.com.kydc                              Katie Gannon 01/08/2016

```
1    CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE
     IN THE FOREGOING ORAL EXAMINATION TRANSCRIPT:
2
     (NOTE:  If no changes desired, please sign and date where
3    indicated below.)

4
     PAGE       LINE              CORRECTION AND REASON
5

6

7

8

9

10

11

12

13

14

15

16

17
     I, KATIE GANNON, hereby declare under penalty of perjury
18   that I have read the foregoing deposition and that the
     testimony contained therein is a true and correct
19   transcript of my testimony, noting the corrections above.

20
                        KATIE GANNON
21
                  Date
22

23   See:  Wash. Reports 34A, Rule 30(e)
            USCA 28, Rule 30(e)
24     PLEASE RETURN TO:  Central Court Reporting,
       1700 SEVENTH AVE., SUITE 2100, SEATTLE, WA 98101
25
```

Central Court Reporting   800.442.3376

Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

1                    C E R T I F I C A T E

2        I, Laura Gjuka, a Certified Court Reporter in

3    and for the State of Washington, residing at

4    University Place, Washington, authorized to administer

5    oaths and affirmations pursuant to RCW 5.28.010, do

6    hereby certify;

7        That the foregoing Verbatim Report of Proceedings

8    was taken stenographically before me and transcribed

9    under my direction; that the transcript is a full, true

10   and complete transcript of the proceedings, including

11   all questions, objections, motions and exceptions;

12       That I am not a relative, employee, attorney or

13   counsel of any party to this action or relative or

14   employee of any such attorney or counsel, and that I am

15   not financially interested in the said action or the

16   outcome thereof;

17       That upon completion of signature, if required, the

18   original transcript will be securely sealed and the same

19   served upon the appropriate party.

20       IN WITNESS HEREOF, I have hereunto set my hand this

21   12th day of April, 2016.

22

23

24
                    _____
25                  Laura Gjuka, CCR No. 2057

Farr vs. Amazon.com.kydc

Katie Gannon 01/08/2016

**$**

**$15,000** 12:3

**$32** 9:16,17

**1**

**1** 18:23 19:1 30:4 51:3 64:7,10,13 65:7

**10** 72:4

**10:39** 28:15

**11:22** 76:10

**11th** 23:24

**12/29/2014** 19:4

**12/30** 66:4 69:15

**12/30/2014** 65:22

**14** 73:16

**15** 9:23 72:4

**1700** 5:2

**184th** 6:24

**2**

**2** 28:20 64:21

**2014** 19:11 20:7 23:24

**2016** 5:2

**2057** 5:3

**206 465-3825** 7:24

**2100** 5:2

**24840** 6:24

**29** 19:11

**29th** 20:2 28:16 39:2

**3**

**3** 65:16

**30** 34:2

**30th** 9:22 73:16

**311** 21:21 25:3 28:13

**312** 20:10 26:24

**31st** 9:22

**4**

**4** 65:7,17,20

**40** 14:15 17:13

**401(k)** 8:21

**45** 16:20

**458** 64:19

**5**

**5** 62:20,21 64:19 69:2,12 73:9,13

**5.2** 65:6,10

**5.28.010** 5:6

**5.4** 64:24 65:10

**5/11/81** 6:22

**50** 14:4,10

**59** 16:3

**6**

**6** 69:1 70:19,20 72:6

**60** 14:8,12 16:22 34:2

**60s** 16:4

**6:00** 14:21

**7**

**70** 14:8,12

**72** 11:18

**73,000** 11:18

**77,000** 8:16

**7:00** 14:21

**8**

**8th** 5:1

**9**

**9** 70:18

**98042** 6:25

**9:17** 5:2

**9:30** 14:20

**A**

**a.m.** 5:2 28:15 76:10

**absence** 16:1

**absolutely** 63:5

**access** 15:2,15 64:25 65:8

**accommodations** 16:1

**accomplish** 37:1

**account** 27:11,24 43:10

**accurate** 28:1

**accurately** 30:19 63:7,12

**achieve** 38:5

**acting** 20:21

**action** 36:22

**active** 24:19 46:3,5 47:14

**activities** 10:5

**actual** 74:18

**additional** 31:1

**address** 6:23 7:15 11:8 60:9

**addressed** 29:7 32:2 42:11

**admin** 51:19

**administer** 5:5

**advance** 58:16

**affirmations** 5:6

**affirmative** 38:3

**agree** 69:22 75:25

**agreed** 76:5

**agreement** 60:25 61:2,5

**ahead** 6:17 62:4 67:10

**alerted** 52:14 54:2



Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

**aligned** 20:14 42:22 43:9

**aligning** 43:1,11,15

**alignment** 20:15 30:25 41:15

**allowed** 15:2 17:10 31:24 46:6
48:24 52:20 53:4 54:19 56:14,24
57:3,16 75:15

**allowing** 64:25 65:1,8

**Amazon** 9:19,20,25 11:16,24
12:5 13:21,23 14:2,18 15:10,19
17:3,8 19:15 20:4 24:14 26:6,8,13
33:19 38:7 43:3 49:18,25 58:20
60:22 61:8,21 63:1 66:8 67:14

**Amazon's** 15:2 17:17 50:10
60:14 63:7,13

**Amazon-issued** 63:21

**America** 10:10

**amount** 17:9

**amounts** 20:7

**Ann** 6:20

**annually** 11:18

**answering** 5:24 57:22

**answers** 6:8

**anymore** 12:6,8

**apologize** 58:3

**appeals** 58:13

**appearing** 5:16

**appears** 65:20,21 69:14 72:6

**apply** 64:16

**approached** 44:21

**approaching** 46:20

**appropriately** 65:10

**approval** 24:1,11 45:23,25 46:2
48:6,9

**approve** 20:18

**approved** 9:12

**approximate** 65:4,11

**April/may** 9:6

**area** 47:1 54:24 63:21

**areas** 35:9

**aspects** 12:11,13

**assistance** 10:5 13:19

**assisted** 10:11

**associate** 20:14 24:1,12,16 25:5,
7,18,20,24 26:11,17 27:3,22 28:5,
8 31:19 33:8 37:5,11,24 38:3
40:25 41:21,23 42:6 44:2 45:4
46:9 48:24 52:16 56:1 69:24,25
70:11 74:17 75:12

**associates** 25:8,21 27:1 31:24
32:4,9 41:24 42:4

**assume** 32:16 41:8 47:20

**assumed** 27:25

**assuming** 27:20 31:16 57:9,
58:10

**assumption** 69:24 74:16

**attached** 21:22 22:19 51:10

**attachment** 22:17

**attachments** 22:8,10,15,20,24
23:5

**attended** 49:23

**attention** 69:19

**attorney** 61:7,12,13,16,18,24,25
62:2

**August** 8:14 14:6

**authorized** 5:5

**Avenue** 5:2

**aware** 20:6,8,15 45:3 55:1 65:24
70:10,14 74:8

---

**B**

**back** 21:21 25:11 28:12 41:13
46:19 52:5 55:19 58:13 70:23
73:4,5 75:15

**bad** 19:19 40:1

**badge** 24:19 43:13 46:3,5,6 47:1,
15,18 48:2,10,13,16,17,24 49:6,
21,22 50:1 52:20 53:12,13 54:4,8,
19,20,22 55:2,9,24 56:14,15,16
57:3,16 58:8,24,25 59:15,20,21,
24 60:1,4,6

**badge-in** 52:16

**badged** 48:10 74:25

**badging** 49:16 75:7

**ball** 53:20

**based** 20:22 55:6 56:12,13 76:5

**basis** 11:10 12:20,21,22 14:23
61:22

**bathroom** 45:22

**BECU** 8:13 9:3,18

**began** 53:25

**beginning** 21:21 32:24

**begins** 21:22

**behalf** 61:8,14

**believed** 9:10

**believing** 42:22

**benefits** 8:17,19,20 12:10

**big** 40:25

**birth** 6:21

**bit** 54:6 73:3,12

**boards** 31:23

**Boeing** 8:9

**bonus** 11:19,20

**bottom** 20:10 40:19

**breach** 28:3,4 32:25 40:5

**break** 6:15,17 52:5,8 72:19,22

**breaking** 67:13

**Bridget** 19:3 20:18 24:5 27:25
29:15 30:2 32:23 35:2 42:1 43:16
44:12 51:3,8 56:12 71:3,24,25
72:8 73:15 75:23 76:3

**Bridget's** 32:15

**bringing** 75:12,18

**broke** 50:18

**building** 7:13,15 18:1 24:2,12,
17,20,22 25:24 26:12 28:5 32:2
40:18 41:21 43:13 44:9,13 45:4,7,
9,13 46:7,9,24 47:4 48:3,9 50:1
52:21 53:1,5,6,13,17 54:2,3,5,12,
13,14 55:3,10,24 58:14 59:7,22
60:12 64:1 69:25 70:12 74:17
75:13,16

---



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 82 of 92 - Page ID#: 487

Farr vs. Amazon.com.kydc                                      Katie Gannon 01/08/2016

**buildings** 41:12

**bullet** 25:2,17 63:19

**bumped** 17:13

**business** 10:1 15:11 60:22 61:21 71:12

**C**

**call** 8:12 26:15,16 30:13,17,24 31:4,14 32:24 36:18 42:24 74:18

**called** 30:22 35:18,20,21

**calling** 39:16 43:18

**callouts** 32:3

**calls** 26:19

**cameras** 26:8

**capacity** 17:19 61:20

**career** 63:1

**cart** 67:7 68:2,9

**case** 26:17 54:18

**cases** 58:12

**Category** 64:7,10,13,21 65:7

**Catherine** 50:11 51:5 69:6

**CCR#** 5:3

**center** 10:18 11:3,7 15:12 17:25 18:19 41:6

**centers** 18:4 31:23

**Certified** 5:4

**chalkboards** 31:24

**challenge** 13:25 62:3

**challenging** 13:24

**chance** 30:6

**channels** 75:1

**chat** 31:3

**check** 15:17,18

**checked** 46:17

**children** 7:9

**Christy** 19:12 21:25 23:10,15,25 24:11 27:8,21 28:7 29:16 31:17 32:3 33:7 39:3 40:7,13,16 41:20

42:2,7,9,13,17 44:5,24 45:1,3 51:19 53:2,7 63:24 64:14 65:4,11, 25 68:5 69:10,22 70:7,10 71:3,18 72:7 74:2,4,6,13,20 75:12,14 76:1

**Christy's** 51:20,21 71:12 73:24

**circumstance** 48:15 49:21 54:7 55:1 56:13 57:15 58:5,21 59:23, 67:24

**circumstances** 35:18 50:3

**clarify** 74:7

**clear** 6:1, 62:7

**click** 29:22

**client** 10:3 12:23 13:9 52:17

**close** 41:5 52:3

**closely** 65:4

**co-worker** 38:6

**coach** 23:25 36:11 41:19,20 45:18 48:16,24 49:4,16 52:20 53:12,22 54:18 55:5 56:6,14, 57:16 58:7 69:23

**coaches** 49:18,20

**coaching** 33:17,19 34:12,24 35:21 36:5,14,17 37:21,23 38:18 39:10 42:18

**Coast** 10:11

**COBRA** 68:14

**communications** 62:9

**company** 19:22 27:2 42:4

**compensated** 62:15

**compensation** 9:15 11:16 16:2

**complaint** 32:11

**complaints** 27:3,22 28:8 31:20 32:4,6,9,22 33:7,8 42:6 44:2

**complete** 17:20

**completed** 9:12 66:7

**completion** 27:2

**complex** 57:8

**complicated** 57:8

**computer** 15:2

**concerned** 43:14 44:4,7

**concerns** 11:5,8

**concluded** 76:10

**conclusion** 76:4

**conduct** 63:8 75:6

**conferenced** 71:5

**conferences** 16:16

**confused** 37:22

**confusing** 39:18

**Congratulations** 7:5

**connected** 42:24

**connection** 52:11

**constant** 31:19 32:9,16 33:8 42:6

**contact** 38:5

**contacted** 55:25

**contemporaneous** 29:19

**continue** 33:12

**continued** 27:3,22 28:8

**continuing** 43:17

**contractors** 65:1

**contribute** 71:22

**contributed** 27:7

**conversation** 29:14,19,22 30:2, 9,19 34:13,14 36:5,15,17 37:23 38:14 40:4 41:16 42:19 53:5,8 54:1,17 56:12 59:3,10 60:6 71:25 75:11,14

**conversational** 37:12

**conversations** 27:12 35:16 36:12 37:17,21 39:11

**convicted** 8:1

**cop** 57:6

**Copetas** 5:15 18:20 19:2 26:21, 23 28:18,21 38:15 43:20 52:3,9 57:5,13 58:11,15 60:19,23 61:3, 22,25 62:5,12,14,18,22 65:13,18 68:25 69:3,10,11 70:17,21 72:15, 21,23 73:3,11,17,23 76:9

**copy** 18:23 28:19

**correct** 10:24 11:13 13:5 15:4



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 83 of 92 - Page ID#: 488

Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

17:8,11,15 20:16,23,25 24:7,15
25:9 28:6,10,11,16 29:17,21
30:18 32:23 34:3 38:18 46:16
48:23 52:19 58:18 60:2 62:11
63:20 64:2 66:1 69:15,16 71:2,6
74:5, 75:21

**correctly** 21:25 24:3

**counsel** 43:3 50:10 60:14 76:7

**couple** 5:18 9:14 17:5

**court** 5:4,11 6:1 18:21

**covered** 49:24

**Covington** 6:24

**Credit** 8:9

**crime** 8:1

**current** 6:23

**cutting** 54:6

**CVG1** 21:25

---

**D**

**dangerous** 67:25

**date** 6:21 36:20

**dated** 19:3 69:15 73:16

**day** 9:20 17:25 18:14,15 65:24
66:7 74:23

**day-to-day** 11:10

**days** 34:2

**deal** 40:25 52:17

**December** 19:11 20:2 23:24
28:16 39:2 73:16

**decided** 9:4

**decision** 20:19 29:15 40:9 42:23
43:1,9,11 54:17 76:5

**decision-making** 31:7,17

**decisions** 27:1,22 28:8 40:1 42:3

**defendant** 8:3

**defense** 11:4

**definition** 32:15

**delivered** 13:12

**demanding** 17:2

**dental** 8:20

**department** 25:7,19

**depended** 14:3

**Depending** 41:11

**depicts** 63:7

**deposition** 5:20 50:6,7 60:18,22
62:3,10

**Describe** 33:18

**desire** 65:25

**desk** 23:11 44:21 47:6 59:9

**determined** 33:23

**development** 13:18 33:16 34:7,
9,21 35:6,7,12 36:16 39:5,9,18,22
72:7

**deviating** 66:25

**differentiated** 39:17

**direct** 65:2 69:19

**directed** 32:4

**direction** 36:3 73:4

**directly** 49:7,12

**disciplines** 13:6,7,14

**discuss** 40:2 60:15 61:11

**discussed** 31:11 41:13

**discussion** 17:21 33:11

**discussions** 42:9

**distance** 41:5,7

**dive** 31:15

**document** 19:5,9 27:11 28:19
29:1,11 35:7,8 36:11 38:24 62:23
63:6,15 65:14,15 66:2,19 69:1,17
70:18,23 72:10

**documentation** 28:9

**documented** 36:4,5,10

**documents** 20:3 22:19 50:16,17,
20,21,24 62:19 66:18

**door** 40:20 41:1

**downhill** 35:3

**drop-off** 34:22

**dropped** 53:20

**drove** 71:25

**duly** 5:10

**duties** 10:2 11:6

---

**E**

**e-mail** 19:3,6 21:14,21 22:9,10,
11,12,20,23 23:4,23 28:13 29:3,6,
12 30:3 31:2,6 41:15 51:2,9,11
65:20,21 69:14 70:4 74:9,10,12

**e-mails** 50:25 51:1

**earlier** 30:3 69:4 73:22

**East** 10:11

**effect** 34:1

**efficient** 17:18

**elevate** 9:4

**employed** 8:8,9 9:18

**employee** 9:1,9,15,16 10:5,8,9
11:5,6 12:9,22 13:7,13 19:15,19,
24 23:13 24:19, 33:22 34:3,6,8
36:23 37:1,13,19 40:17 43:13
44:9,14,20,22 45:6,8,21 47:17,18,
20 48:2,16 51:19 52:21 53:4 54:8
55:2,14,17 56:3,5,9 57:17 58:7,
23,25 60:2,6 67:13 68:12 75:1,8,
14,16,18

**employees** 8:9 11:10 36:12
44:15 58:13 67:16

**employment** 68:13 76:5

**end** 9:10

**ended** 16:4 42:25 53:7

**energy** 12:9

**engage** 31:17

**engaged** 64:14

**enter** 63:21,25

**equity** 8:22 11:21,23

**escort** 46:19 65:1,2,9 69:23

**escorted** 25:5,18 45:2 46:14,19

**escorting** 45:14

---



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 84 of 92 - Page ID#: 489

Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

evaluating 27:19

evaluator 20:21

evenings 14:22

events 75:10

evidence 57:9 58:10

exact 35:15

EXAMINATION 5:14 73:7

examined 5:11

examples 31:10,12 35:15 39:7, 21 68:8

executive 9:13

exempt 17:1

exhibit 18:21,22,23 19:1,7,11 20:10 28:20 30:4 51:3 62:21 65:17 69:2,12 70:19,20 72:5,6 73:9,13,14

exit 66:14 68:23

expect 7:19 26:6 36:9

expectation 46:21

expectations 33:20

expected 17:16,18,19

experience 17:23

explained 56:1

explaining 56:8

explanation 70:5,15 73:24

eyes 72:12

___

**F**

facility 64:25 65:8

fact 44:6,8 55:10

facts 20:22,24 43:5,16 52:19 57:9 58:10 64:3

failed 48:19,21 49:15,16

fair 20:19 24:17,24 25:25 36:4 43:14 75:17

faith 21:3

familiar 10:25 18:16 64:10

Farr 19:12 23:25 29:16 39:3

65:25 68:5 69:10 71:3 72:7 75:12 76:1

FC 41:11

February 14:6

fee 60:24 61:2,4

feel 6:4 68:20

figure 52:25

find 12:7 47:15 52:24 53:19 54:1 59:10

fine 21:19 45:1,25 46:3

finish 6:10,16

finished 7:18

fire 40:13 44:5 65:25

fired 53:9

five-minute 72:19

floor 44:21

FMLA 20:7

focus 12:9 32:24

focused 27:10,15

follow 37:4 44:16 66:4

follow-up 30:3

foresee 9:8

forever 26:9

forget 47:14

forgot 23:5

form 23:18,22

forward 27:13 59:11,12 66:3,6 76:7

found 47:24 53:2 55:24

free 6:4

frequently 13:7 16:15

friend 9:3,5

front 22:16 23:11

froze 25:10

fulfillment 10:18 11:3,7 15:12 17:24 18:4,18 31:23 41:6 63:14

full 6:19 8:14,20 26:24 68:22

full-time 9:9,11

fun 12:15

___

**G**

Gannon 5:10 6:20 18:22 28:19, 22 43:21 49:3 50:5 52:10 55:1 58:20 59:25 60:13,17,20,24 62:8, 15,19,23 65:14,19 69:1 70:18,22 73:9,15,20 75:22

gap 49:8

gather 31:1

gave 22:2 23:25 24:11 31:10 38:23 41:14 68:12

general 5:23 63:16

generalist 10:4

generally 17:12

giant 41:6

give 6:10 18:22 22:4 34:5 67:15, 17 69:22 72:16

giving 20:22,25 28:6 36:25 37:10 38:2,21,22 43:12 44:14

GJUKA 5:3

GM 20:13 21:11,15

goals 37:6,10 38:3

good 19:18 69:7

governs 63:4

grades 9:14

great 13:23

grounds 68:17

group 10:3 13:9 19:15 52:17

groups 12:23

guard 56:4

guess 18:4 26:6,22 27:19 28:7 30:24 32:18 37:22,23 41:3 60:9 70:19 71:22

Guidelines 63:17

guilty 8:1

guy 24:11

guys 50:14

___



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 85 of 92 - Page ID#: 490

Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

## H

**half-mile** 41:9

**hand** 18:21 28:19 62:18 65:14 68:25 70:17

**handed** 65:19 69:12 70:23 72:5

**handled** 76:3

**handwrite** 29:10

**handwritten** 22:6

**happen** 48:4 49:11 56:23

**happened** 49:17 53:14 56:19 73:24 75:2,10,15

**hard** 18:11 58:20

**hard-and-fast** 49:25

**head** 5:25 68:20

**hear** 70:7 74:17

**heard** 19:12,13 49:12 70:4 73:24 74:4,13

**held** 44:15

**helps** 27:6

**Hey** 40:24 49:5 53:22

**hiccup** 25:15

**high** 17:17 64:12

**high-risk** 21:24

**higher** 14:8 44:15

**hire** 18:16 27:2 61:9,10

**hired** 10:15,17 61:8

**history** 26:25 27:11,21 28:2,7 42:2

**hold** 26:9,13,16 65:14

**home** 14:22,23 15:5,8 16:11

**honest** 31:16

**Honestly** 41:12

**hoops** 24:20

**horse** 67:7 68:3,9

**hotel** 15:13

**hour** 9:16,17

**hour-and-a-half** 52:4

**hours** 14:2,4,14,15 16:18,20,22 17:13,19 50:15 60:14,15 62:9

**house** 7:1,13,15

**HR** 10:4,9,12,20,23 12:22,23 14:5 18:18 21:15 23:11 44:14,21,23 45:17 46:11,17,18, 47:20 48:6,8 49:1,5,7,12 53:18, 60:22 61:21 71:12

**HR'S** 45:23,25 46:2

**HRA** 10:25 11:2,4,14 26:25

**HRAS** 10:20,22 17:6,10,12,23

**HRBP** 10:2,3 12:11,14 15:20,22

**HRBPS** 11:12

**HRM** 20:13 21:11

**human** 10:1,12,13

**hundred** 43:12 54:23

**hurt** 26:17

**hypotheticals** 43:19

## I

**I-9** 27:2

**idea** 19:21 66:23 75:4,5

**identification** 19:1 28:20 62:21 63:22 64:1,4 65:17 69:2 70:20

**identify** 64:13

**illustrate** 40:24

**improve** 35:10 36:2 38:22

**improved** 34:17,21

**improvement** 13:10,15 36:20

**improvements** 35:2

**in-house** 43:2

**inactive** 46:6

**incident** 39:2 52:11 65:25 74:23

**include** 23:5

**included** 10:4

**includes** 65:1

**increase** 35:1,16 36:23 39:13

**increased** 16:21

**independent** 20:21

**independently** 21:2

**individual** 61:13,16,20

**individually** 60:20

**individuals** 33:20

**information** 27:6 31:1 41:14 42:25 47:16 52:24 53:3,17,19 65:6 67:15,17

**informational** 9:7

**informed** 61:14 74:25

**informing** 32:23

**Infraction** 64:14,22

**Infractions** 64:8,10

**initial** 76:2

**inquire** 46:21

**inside** 45:7 47:2

**instructing** 62:7

**instruction** 43:12

**instructional** 38:7

**instructions** 5:18 38:25 39:1

**interested** 12:6,8

**internal** 50:10

**interrupt** 6:8

**interview** 9:6

**interviews** 9:7

**intoxicated** 68:4

**introducing** 71:16

**investigating** 47:11,12

**investigation** 21:6 22:3,5 30:7, 12 51:7,8,10,12 68:13,15 76:2

**investigation/termination** 21:23

**investigations** 10:6

**investigator** 21:5,7

**involve** 59:12

**involved** 12:19 13:4,6,7,9,14 27:12 36:14 65:7



Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

**involves** 18:17

**involving** 21:24

**issued** 48:13

**issues** 11:12 27:2 60:9

**issuing** 59:12

**item** 63:16 64:19,24

**items** 36:22 44:7

---

**J**

**January** 5:1 14:6

**job** 8:10 36:24 44:16

**judgments** 39:25

**July** 7:20

**June** 8:14

---

**K**

**Katie** 5:10,16 6:20 28:24 73:15

**kicked** 22:25 23:1

**kind** 11:8 14:14 35:3,23 39:18 65:4

**knew** 21:13 26:8 44:6 45:3 55:16 56:3,8

**knowledge** 28:1 68:6 72:13,14

---

**L**

**laid** 72:12

**land** 41:6

**large** 12:23

**lasted** 72:3

**Laura** 5:3 18:21 28:18 62:5,18 65:13 68:25 69:6 70:17

**lawsuit** 8:4,6

**lawyer** 43:3

**lead** 21:5,7

**learn** 36:24

**learned** 43:5,6,15

**leave** 9:20 11:23 12:5 14:20 16:1

**Lee** 6:20 73:15

**left** 11:17,23 12:2 16:21 45:12

**legal** 35:17 42:24 43:2 50:10 76:6

**letting** 44:13 45:14 71:18

**level** 8:15 9:13 33:6 37:20 76:3

**lied** 68:15 75:23

**lies** 43:7

**life** 8:11

**likelihood** 7:12

**limit** 17:9

**lines** 6:7

**listen** 71:8

**listening** 72:1

**lists** 64:7

**lived** 7:3

**LOA** 16:2,9,13,15,19,23

**log** 14:21 15:15

**logged** 14:25

**long** 7:3 19:21 41:12 45:1 46:18 50:14 72:3

**longer-term** 19:15,24

**looked** 47:7

**lot** 11:5 12:22 21:20 57:8

**lots** 35:15

**low** 16:4

**lower** 9:14

**lower-level** 11:8 13:14

**lying** 43:25 44:1,2,6

---

**M**

**made** 32:21 40:9 43:7

**main** 31:14

**make** 5:23 26:15,16 32:7 36:6 39:12,20 41:18 44:3,16 54:17

**makes** 6:5

**making** 26:25 27:21 42:3 53:10

**managed** 66:8

**management** 9:13 10:6 12:10 32:1, 48:6 53:18

**manager** 10:11 13:12,19 17:22 21:16 33:22 34:10 37:7,13,16

**managers** 36:11 39:10

**manual** 66:17

**Maple** 7:16,18

**mark** 62:6,12

**marked** 18:22 19:1 20:10 28:20 30:4 62:19,21 65:16,17,19 69:1,2, 12 70:18,20 72:6

**married** 7:7

**material** 66:21

**matter** 28:3 46:5

**meant** 40:2

**medical** 8:20

**meet** 17:17 36:19 50:14

**meeting** 33:20 35:24 37:5 48:11 50:12,16,21 54:14 59:6 67:11 70:24 71:2,7,9,12 72:3 73:19,25 74:2,10,15

**meetings** 37:7

**member** 16:18 44:23

**memorized** 7:16

**messages** 23:2

**met** 50:8 60:13

**milestones** 36:19

**mind** 68:4

**mine** 9:3

**minimum** 16:22

**minor** 7:25

**minutes** 72:4,16

**misinformation** 68:12

**misrepresenting** 43:16

**missed** 38:4

**mistake** 44:11



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 87 of 92 - Page ID#: 492

Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

**models** 18:2

**moment** 19:4 28:22 61:11 63:6

**month** 13:1,3 33:11

**monthly** 12:21

**months** 31:7 32:14

**move** 7:12 12:10 27:13 36:3 59:11 66:3,6

**moved** 76:7

**moving** 40:4 59:12

---

### N

**names** 21:18

**necessarily** 29:9 36:16 37:12 38:25

**needed** 13:19 14:21 15:15 31:1 44:22 46:23 52:24 53:1,5,6,16 59:6 67:14

**negative** 12:11,13

**network** 63:14

**nightshift** 18:14,15

**no-no** 24:14 53:15 57:2

**noes** 5:24

**North** 10:10

**notebook** 23:19

**noted** 27:11 39:14

**notes** 29:4,7,10,14,25 30:19 35:22 37:16,17 38:13 56:12

**notified** 56:18 75:1

**number** 7:23 32:21 49:14 64:18

**numbers** 20:10 67:23

---

### O

**oaths** 5:5

**objection** 26:19 38:11 43:18 57:4 58:9 60:16

**occasionally** 13:11,18 16:14

**occasions** 67:9

**occur** 75:7

**occurred** 39:22 68:5 74:23 75:18

**office** 14:20 15:3,14 16:24

**officer** 55:8,12

**official** 9:7

**OLR** 14:5

**one-on-one** 33:21 34:13 35:20, 23,24 37:14

**one-on-ones** 36:12

**Onenote** 29:11,13

**ongoing** 33:11 42:9

**op** 51:19

**operating** 20:24

**operations** 10:9,12

**opinion** 44:25

**opportunities** 11:15

**opportunity** 8:22 11:19 20:3

**opposed** 5:24

**order** 30:11 54:17 65:15

**organization** 18:18

**orientation** 18:16

**orientation-type** 11:6

**Outbound** 25:6,19

**outline** 72:16

**overnight** 68:23

**overtime** 17:9

---

### P

**package** 8:20

**pad** 23:19

**pages** 66:20

**paint** 27:6

**paper** 23:19,20

**paperwork** 27:2 66:4,12,13 67:2, 11,19 68:10,22

**paragraph** 20:12 21:10 26:24 31:6 55:23

**paramedic** 55:8,11 57:6

**parents** 7:14

**part** 30:24 40:14,15 53:7 74:16

**participated** 70:24 73:20

**partner** 10:1 60:22 61:21 71:13

**partnered** 20:13 21:11

**pass** 54:20 59:13,20

**past** 47:8,9 67:12

**peak** 14:4,5 17:14 34:17,22 35:3

**pension** 8:21

**people** 13:25 21:12,17,20 25:24 26:12 29:5 44:16 48:8 52:14 54:2 56:18 67:19

**people's** 35:16

**percent** 43:12 54:23

**performance** 10:6 13:10,15 14:7 20:4 33:24 34:10,12,21 35:1,9,17 36:23 39:10,13 42:10 43:11

**period** 9:6 14:5 33:22,25 44:11 59:2 66:15

**periods** 14:9

**permanent** 9:9

**permission** 28:6 44:14 45:6,17 46:22,23 47:21 69:23

**person** 13:23 23:11 36:21 44:23, 24 46:11,13,18 47:13 48:2 49:16 52:15 53:1,4,6,13,16 54:1,3,12 55:9 57:21 60:5 63:20 65:7 74:25

**person's** 39:13

**personality** 13:24

**personally** 61:10

**personnel** 53:9

**phone** 7:23 29:5,17 30:9,13 70:25 71:5,19 74:18

**physically** 57:24

**pick** 52:5

**picture** 27:7

**picturing** 41:4

**piece** 23:19

**PIP** 37:20

---



Case: 2:15-cv-00064-WOB-JGW   Doc #: 43-1   Filed: 06/29/16   Page: 88 of 92 - Page ID#: 493

Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

**place** 5:5 6:24 13:21,24 17:2 30:24 37:8 47:5,23 48:5 56:23

**plaintiff** 8:3

**plaintiff's** 75:6,17

**plan** 13:10,18 33:16 34:7,9,15,21, 24 35:5,6,7,8,11,12,19,21 36:9, 13,16,25 37:5,9 38:2,10,17,19 39:4,5,8,9,12,15,16,18,21,23 42:14,18,19 43:8 72:7

**plans** 13:15 35:16

**pled** 8:1

**plot** 41:6

**PM** 9:4

**point** 6:15 13:9 25:2,17 63:19

**police** 55:8,12

**policies** 63:13

**policy** 27:10 38:7 44:16,17 49:18,19 63:3 67:14 75:6,18 76:6

**poor** 26:25 27:22 28:8 31:7,17 42:3

**population** 10:8,9

**position** 9:25 10:15,25 57:11

**positive** 12:9

**practice** 67:1

**prefer** 14:16

**premises** 67:14

**prepare** 50:6

**prepared** 68:23

**pretty** 9:17 13:21 25:23

**previous** 39:15

**primarily** 16:11

**primary** 15:5

**printed** 22:21

**prior** 15:23,25 19:11 20:2 30:9 39:2,8 50:5,20 61:11 62:9 69:19 70:4 75:7,18,20

**privilege** 61:23

**privileged** 51:6 60:16

**problem** 31:25 32:22 33:7

**problems** 42:10

**procedure** 48:12

**procedures** 63:4

**proceedings** 5:7 76:10

**process** 9:6 11:5 32:1 36:22 38:5,8 52:17 54:10,20,23 58:14, 66:17

**program** 8:11

**promoted** 10:16

**promotion** 11:15

**proper** 75:1

**provide** 34:10,15 38:10

**provided** 50:17,22,25 68:14

**providing** 38:23

**PTO** 8:21

**pull** 56:25

**purposes** 60:17,21 62:2

**pursuant** 5:6

**pushing** 44:3

**put** 26:9,13,16 32:18 34:6,20,24 42:13, 43:17 68:2,8

**putting** 67:7

---

### Q

**quarter-mile** 41:10,12

**question** 6:3,10 54:11 56:22 57:14,22 58:11 60:8 61:4 70:7 73:22 75:9

**questioned** 47:7

**questioning** 6:16 60:11

**questions** 5:19 6:9 17:5 47:24 53:19,25 54:16 62:8 70:22 72:24 73:2

**quick** 35:22 39:25

---

### R

**rate** 16:5

**RCW** 5:6

**reach** 7:23 36:21

**read** 21:25 24:2 30:7 32:1 51:20, 21

**ready** 9:11 28:24,25 67:11 68:10 72:18

**real** 58:20

**realized** 55:17

**reason** 24:5,8 31:14 40:12 45:5, 16,23 46:22 52:25 53:16 59:3,5 66:25 68:2 71:23 75:22

**reasoning** 59:10 67:3

**reasons** 24:24

**recall** 16:5 21:18 22:2,5 23:2,14, 17,18,21,22 26:5 30:6,11 31:10, 12 39:3,6,14,24 44:18,20 45:2 51:12,14,18 69:17 70:6 71:10,11 72:3

**recap** 73:19

**received** 27:9 28:15 74:9,10,12

**receiving** 19:11 23:21 31:2 69:17 70:4

**recent** 9:25

**recognize** 19:5,9 29:1 62:23

**recognized** 19:17,25 32:22

**recollection** 52:1 74:20

**recommended** 9:5

**record** 6:19 16:25 21:17 29:8,9 32:7 43:18 62:6,13 75:25

**redacted** 66:20,23

**referring** 21:14 27:4

**reflect** 30:19 63:12

**regional** 21:15

**regressed** 34:17

**regular** 14:23 37:7

**relating** 20:3

**relations** 10:5 12:22

**rely** 60:9

**remember** 23:4,7,8,13 30:22 51:20,21,22 56:5

**REMEMBERED** 5:1

---



rep 42:24 43:2 45:17

repeat 42:16 43:22,23

rephrase 6:5

report 10:22

reporter 5:4,11 6:1 18:21

reports 19:16

represent 61:5

representing 60:17,19 61:12,17, 20,21 71:13

request 24:7

requesting 24:9 40:13,16

rereading 38:6

reserved 76:11

residing 5:4

resources 10:1,13 34:11

respect 63:13

response 73:22

rest 24:2 25:6,18 40:20 41:1,25 44:23 45:12,14,15 46:1,4,11,12, 14, 66:19 69:24

restaurants 40:20 41:4

resulted 34:21

resulting 27:1 42:3

retrained 36:22

retraining 38:6

review 13:10,19 20:3 28:22 50:16 51:7 63:6 76:2,3

reviewed 22:7 42:25 50:20 51:14,17 62:24,25 76:6

reviewing 25:7,20 27:24

reviews 14:7

RHRM 20:13 21:11

Richardson 23:25 57:11 75:4,11

Richardson's 75:7

risk 27:1 64:12

risks 42:3

role 9:3,4,5,11 12:6,8,11,14 15:20,22,23,25 16:4 52:25 54:24

Rolfes 19:3 20:12 21:8 23:24 27:8,17 29:15 30:8, 34:20 38:9, 12,16 40:2,12,24 41:14 43:5,24 65:21 67:5 69:14,21 71:3 72:8 73:15 75:23

Rolfes's 65:25

room 24:2 25:6,18 41:1,25 44:23 45:12,14,15 46:1,4,12,14,19 69:5, 8,24

rooms 40:20

roughly 13:1

rule 49:25

rules 5:23

run 72:17

Ryan 23:25 24:11 40:9,17 55:25 56:4,6

## S

Sadhna 18:23 50:8,12 61:23 62:7 69:6 73:11

safe 14:16

salary 16:6

sat 18:19 53:12

save 26:9

saved 26:10

scheduled 31:3

SDP 33:12,15,16,23,25 34:3 35:17 37:20

season 14:5 17:14

seasons 14:12

Seattle 5:3

second-to-the-last 19:7

secure 63:21

security 24:18 25:1 27:13 28:3,4 32:25 40:5 44:10 46:25 47:1,4,6, 9,13,17,22 48:4,6,15,20,23 49:1, 4,5,6,10,19 52:10,20 53:5,8,12,20 54:7,21 55:4,6,9,16,17,25 56:3,4, 8,13,17,18,22,24 57:10,14,15 58:6,22 59:9,19 60:5,9,11 63:3,4, 7,13,17 64:8,10,13,21 74:22,23 75:3,20

seek 45:23

send 29:8,23

senior 10:22

sense 6:6 17:23 19:14,18,19,20, 24 34:5

sentence 23:23 40:19

separate 40:16 43:12 58:17 66:8 76:5

separated 68:13,22

separately 22:24

separating 45:22

sequence 75:10

session 35:21

set 58:16

seventh 5:2 69:20

shakes 5:25

shared 34:3

shares 11:24

shift 14:18 17:25 18:9,10,14,15 25:6,19

short 13:8 35:12 39:9,22 52:8 72:22

shoving 25:8,21,24 26:12,17 41:24 44:3

showed 51:3

shows 26:7

sign 48:10

signature 76:11

significant 20:6

simplify 46:8

sit 13:11 36:2

site 20:13 59:6 67:14 76:3

situation 21:24 23:12 27:19 36:1 47:7,15 48:22 68:11,16,18

situations 68:21

sixth 69:20

size 18:2 41:11

Skype 25:14



Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

**SMX** 23:13,25 24:1 41:19, 44:20 45:18,21 48:16,24 49:4,16,18,20, 23 51:19 52:15,20 53:12,22 54:18 55:5,25 56:5,14, 57:16 60:6 69:23 74:25 75:8,14

**solely** 27:9

**sort** 20:21 48:19

**sought** 45:25 46:2

**sounded** 74:7

**sounds** 25:23 34:19 35:23

**Southeast** 6:24

**speak** 71:9

**specific** 10:3 31:12 37:1 39:20 67:23 71:21

**specifically** 10:10 18:13 32:3 39:14 45:5 57:21 66:7 68:20 71:11

**speculate** 18:1 67:4

**speculation** 26:20 43:19

**spoke** 74:6

**spoken** 35:9

**spreadsheets** 19:17

**staff** 11:4,6 17:24

**standard** 44:15 66:10 67:1

**standards** 17:17 63:8

**standing** 23:12

**standpoint** 10:4

**start** 8:12,13 9:1 25:6,19

**started** 8:14 9:5 14:20 16:3,20

**starts** 19:6

**state** 5:4 6:19

**stated** 69:22 74:2

**statement** 23:17,18,19

**statements** 21:23 22:3,6 23:8,14 30:7,13 44:8,18,19,20 51:15,17 76:4

**stayed** 11:25

**staying** 7:13

**step** 48:19

**steps** 48:21

**stock** 8:23 12:3

**stop** 6:4 38:21 57:11 75:3

**stopped** 53:23

**stretched** 11:14

**strewn** 73:12

**strict** 24:18 44:10

**structure** 13:18 39:11,12 42:19

**structured** 33:16,21 34:6,9,13, 15,20 35:5,6,7,8,11,12,19,21 36:9,13,16,18,19,25 37:5,9 38:2, 10,17,19 39:4,5,8,9,15,16,17,21, 22 42:14,18,19 43:8 72:7

**stuff** 10:7 48:11 68:14 73:12

**subject** 71:21,22

**subsequent** 23:2,4

**suggesting** 35:5

**suggestions** 38:23

**Suite** 5:2

**summary** 21:23 22:3,5 51:7,8, 10,12

**supervision** 65:2

**supervisor** 66:11

**supported** 10:4 11:6 19:16

**supposed** 24:16,21 67:15,17

**sworn** 5:10

**system** 15:2 21:15

---

**T**

**table** 11:23 12:2

**takes** 32:6

**taking** 9:10 21:3 30:16,24

**talk** 31:2 35:24 40:4 71:21,23

**talked** 37:21 55:25

**talking** 6:13 36:6,9 52:3 55:11,14

**tape** 42:1

**team** 9:13 12:23 16:1,2,9,13,15, 17,19,23 66:8,14 68:23

**Ted** 57:7 60:17 61:1,19 69:9

**telling** 24:5,8 27:20 33:4 38:22 40:12 49:10

**tells** 7:19 21:10 41:19,20,23

**temp** 8:14

**temporary** 9:1,15,16

**ten-minute** 52:4

**tenure** 19:25

**term** 39:3,4,7 66:8

**termed** 47:2 56:1 67:19

**terminate** 12:15 27:8 29:15 44:12

**terminated** 24:1,12,16,18 25:5, 18,24 26:11 28:5 40:25 41:21,23 44:22 45:3,8 46:9 52:11,16,20 53:4 55:14,16,18 56:3,9 57:21 58:7,13 67:10 68:9 69:23 70:11 71:24 74:25 75:8,12

**terminating** 12:19 13:1 66:11

**termination** 13:8 20:14,19 24:6, 7,9 30:25 42:23 43:15 66:3,4 67:11 68:17 70:24 73:19,25 74:2, 10,15 76:1

**terminations** 67:12

**terms** 17:3 75:6,10

**testified** 5:12 8:6 60:13

**Texas** 10:10

**thing** 36:7 74:24

**things** 5:25 21:2 22:4 35:25 36:20 37:1,14 40:8 42:22 43:25 46:8 49:14 59:17

**thinking** 41:9

**Thompson** 50:11,12 69:6

**thrive** 13:25

**ticket** 66:7,17

**tickets** 66:9

**time** 6:9 8:14 9:6 11:16 12:3,4 13:16 14:3,5,9,10 15:9,14 16:25 17:3,9,20 20:7 21:18 29:13 31:3 33:21,23,25 66:15 70:5,10,14 72:12 73:23 74:1,4,6,8,13

---



**times** 15:20 35:15 54:12 74:19

**today** 5:16 50:7 58:20 61:18 62:16 69:5

**told** 17:12 27:25 35:3 38:16 40:17 41:8 42:1,2,8,13,17 43:8,25 49:1, 3,5 53:22 57:25

**tool** 33:16,19

**tools** 34:11 37:15

**top** 28:12 68:20

**tough** 13:21

**town** 15:13

**traffic** 7:25 14:19

**trained** 49:18,20

**training** 49:23

**transcript** 6:1,7 30:17

**travel** 15:11,12,19 16:13,15

**traveled** 15:11,20

**trend** 33:12

**trending** 33:12

**true** 20:25 26:19 27:20 38:11 42:22 43:6,17 57:4,7 58:9 60:14, 16,21,25 61:1,5,19,24 62:2,11 69:8 73:1,8,14,18 76:8

**truthful** 21:4

**Tuesday** 73:16

**turned** 44:24

**turnstiles** 47:10

**two-thirds** 40:7

**type** 6:2 10:6 29:10 36:22

**types** 37:17

**typical** 18:7 33:25 66:10,13

**typically** 11:14 14:20 17:24 22:10, 37:18 66:14

**typing** 29:20

---

**U**

**uh-huh** 18:6 25:1 31:21 32:20 34:16,18 38:1,18 45:11 46:10 48:14 64:9 68:16 70:3 71:20

**uh-huhs** 5:25

**un-vetted** 65:1

**unclear** 6:3

**understand** 6:4 30:16 31:22 32:21 34:19 36:13 39:16 61:17 63:3,10 75:9

**understandable** 7:21

**understanding** 11:2 32:19 33:3, 6 40:23 41:3 52:14 63:12,25 64:3

**understood** 26:11 32:2,10 33:1 34:23 52:19 71:14

**Union** 8:9

**University** 5:5

**unstructured** 35:23

**unvested** 11:24

**upload** 66:18

**upset** 25:8,20 41:24

---

**V**

**vacation** 15:16

**valid** 59:5

**Valley** 7:16,18

**vendor** 48:13 54:20

**verbal** 35:16 38:25

**verbally** 34:24 35:9 57:24

**verify** 21:2

**vested** 11:25

**video** 26:2,3,4,5,7,8

**violation** 27:10,13 75:7,17 76:6

**violations** 7:25

**vision** 8:20 25:7,20

**visitor** 48:10,13 54:20 59:12,20

**visitors** 64:25 65:8

**visualize** 57:10

**voluntarily** 5:17

**VPN** 14:25 15:6,9,15 16:8

---

**W**

**wait** 66:10,13 67:1

**walked** 45:9,22

**walking** 41:5,7 46:8

**wanted** 9:4,12 12:7,9 27:8 67:5,8 74:7

**Washington** 5:3,4 6:24 7:17

**watched** 53:12

**week** 14:4,15 16:22 17:13

**weekly** 12:20,21

**weeks** 7:4,11

**wellness** 8:11

**west** 10:10

**whatnot** 14:7

**white** 31:23

**Whitley** 73:15

**Whoops** 23:5

**wit** 5:8

**word** 39:11

**word-for-word** 30:17

**work** 8:11 9:20 13:22,24 14:23 15:5 17:10,13,16,18,20,21 33:22 34:25 37:1 43:11 55:25 65:2

**worked** 10:18 14:4 17:2

**working** 14:14,15 15:8 16:24 34:23

**wrap** 72:18

**write** 12:15 31:7,24 32:7 38:12

**writes** 69:21

**writing** 13:20 32:23 35:7,22

**written** 31:13 37:10,19

**wrong** 45:13

**wrote** 38:9,13 40:11 51:8

---

**Y**

**year** 7:12 14:3,9 15:20 16:16

---



Farr vs. Amazon.com.kydc                                    Katie Gannon 01/08/2016

**years** 16:21

**yellow** 23:19

**yeses** 5:24

**yesterday** 50:8 51:13